**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

| | |
|---|---|
| **ALFA CORPORATION, an Alabama corporation;** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION NO.** |
| | ) **2:06-CV-962-WKW-WC** |
| **ALFA MORTGAGE CORPORATION, an Indiana corporation;** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant Alfa Mortgage Corporation ("Defendant") offers this Reply in support of its Motion to Dismiss Plaintiff Alfa Corporation's ("Plaintiff") Complaint:

## INTRODUCTION

Plaintiff, a corporation purportedly organized under the laws of Delaware with its principal place of business in Alabama, initiated this trademark infringement action against Defendant, an Indiana corporation with no contacts with the State of Alabama.  Accordingly, Defendant filed a Motion to Dismiss for lack of personal jurisdiction.  In response to this Motion, Plaintiff makes two arguments: (1) that Defendant is subject to personal jurisdiction in Alabama under the "effects" test; and (2) that the exercise of jurisdiction over Defendant in Alabama is reasonable.  Neither of these arguments is supported by the applicable law or the relevant facts.

## ARGUMENT

**I.  This Court does not have personal jurisdiction over Defendant under the "effects test" because none of Defendant's conduct was expressly aimed at Alabama.**

A defendant is subject to a court's personal jurisdiction when the defendant's conduct and connection with the forum state is such that "he should reasonably anticipate being haled into court there."  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 296 (1980).  The

United States Supreme Court recognized that intentional actions in one state may indicate that a non-resident defendant expected its conduct to have an effect in the forum state; and, therefore, expected to be sued in the forum state. *See Calder v. Jones*, 465 U.S. 783, 789-90 (1984). Under these circumstances, the minimum contacts requirement for personal jurisdiction may be satisfied when (1) the defendant engages in intentional acts; (2) the acts are expressly aimed at the forum state; and (3) the acts cause an injury, the brunt of which is felt in the forum state. *Id*.

Various jurisdictions, to include the Middle District Court of Alabama, have applied the *Calder* effects test to analyze personal jurisdiction to claims for trademark infringement and dilution. In all of these cases, the courts relied on the ***intentionality*** aspect of the *Calder* test; in other words, the courts focused on whether the conduct at issue was ***expressly aimed*** at causing harm ***in the forum state***. *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156 (9th Cir. 2006) (finding that defendant's acts did not give rise to personal jurisdiction under *Calder* because the acts were not "expressly aimed" at California); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397-401 (4th Cir. 2003) (referencing *Calder* and finding that personal jurisdiction over the defendant was improper because the defendant did not intend to specifically target citizens of the forum state); *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 455 n6 (3d Cir. 2003) (stating that the "intentionality requirement is the key missing component for jurisdiction under either the 'minimum contacts' analysis or the 'effects' test"); *Kwik Kopy Corp. v. Byers*, 37 Fed. Appx. 90 (5th Cir. 2002) (finding sufficient personal jurisdiction under the effects test when the franchise agreement at issue was governed by Texas law, the immediate effect of the tortious interference would be felt in Texas, the defendant knew that the franchise agreement was governed by Texas law, and the harm caused by the defendant was "specifically directed" at a Texas corporation); *Finley v. River North Records*, 148 F.3d 913, 916 (8th Cir. 1998) (holding that personal jurisdiction was proper under *Calder* when the defendant's conduct

was "intended to induce commercial activity within the forum state"); *Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 412 (7th Cir. 1994) (finding that, for purposes of the *Calder* test, the defendant intentionally "entered" the state by broadcasting football games within the state of Indiana); *Alfa Corp. v. Alfagres, S.A.*, 385 F. Supp. 2d 1230, 1236 (M.D. Ala. 2005) (applying *Calder* and finding that personal jurisdiction existed because the facts alleged indicated "that Alfagres *knew* it was likely committing trademark infringement specifically against Alfa in Alabama and continued to do so anyway") (emphasis in original); *Full Sail, Inc. v. Spevack*, 2003 WL 25277185 at *6 (M.D. Fla. Oct. 21, 2003) (determining that the *Calder* test was not satisfied because the acts at issue were not "expressly aimed at a Florida audience").[1]

Consequently, to determine whether Defendant expected to be haled into court in Alabama, this Court's relevant inquiry is whether Defendant's use of the name "Alfa" was intentionally and expressly aimed **at the State of Alabama**, to the extent that its actions caused an injury, the brunt of which was felt **in Alabama**. In this case, the record shows that Defendant never expressly aimed any conduct at the State of Alabama. The record is also devoid of any evidence to show that Defendant's alleged conduct caused any injury to Plaintiff, the brunt of

---

[1] Notably, the authority that Plaintiff cites in its Response also expressly supports the contention that the conduct at issue must be **intentionally** aimed **at the forum state**. *See* Pl.'s Resp., pp. 6-7 *citing Coblentz GMC/Freightliner, Inc., v. General Motors Corp.*, 724 F. Supp. 1364, 1370, n.9 (M.D. Ala. 1989) (noting that the effects tests supports personal jurisdiction when the defendant's actions are "purposefully directed" at the forum state); *Bird v. Parsons*, 289 F.3d 865, 874 (6th Cir. 2002) (stating that to establish specific jurisdiction, the defendant "must purposefully avail himself of the privilege of acting *in the forum state* or causing a consequence *in the forum state*") (emphasis added); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) (finding that the effects test was satisfied when the defendant knew his conduct would injure the plaintiff in California); *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club, LP*, 34 F.3d 410, 412 (7th Cir. 1994) (determining that, for purposes of the *Calder* test, the defendant intentionally "entered" the state by broadcasting football games within the state of Indiana); *Dakota Indus. v. Dakota Sportswear,* 946 F.2d 1384, 1390-91 (8th Cir. 1991) (recognizing that the effects test is satisfied over non-resident defendants whose acts "are performed for the very purpose of having their consequences felt in the forum state"); *Bunn-O-Matic Corp. v. Bunn Coffee Serv.*, 46 U.S.P.Q.2d (BNA) 1375, 1377-78 (C.D. Ill. 1998) (specifying that the defendant waived any argument that it intended to injure the plaintiff in the forum state, and that the defendant was on notice that its use of a trademark would cause injury in Illinois). The only case cited by Plaintiff that does not expressly support this contention is not relevant because it does not even apply the elements of the effects test. *See Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1202-03 (7th Cir. 1997) (citing *Calder* and *Indianapolis Colts* but analyzing whether an injury occurred in Illinois).

which was felt in Alabama.  The record further shows that Defendant began using the name "Alfa Mortgage" long before Plaintiff filed to register the name "Alfa" for use in the financial services and mortgage lending business.  *Compare* Ex. A Shelton Dep., p. 12 (establishing March 20, 2001 as the date Alfa Mortgage was incorporated)[2] *with* Pl.'s Resp., Ex. 4 (indicating that Plaintiff filed trademark applications for its financial services business in February, 2002).

Corina Shelton, the president, owner, and sole employee of Alfa Mortgage testified that she was never informed that Alfa Corporation was connected with the State of Alabama, and that the ***only*** contact that she and Alfa Mortgage have ever had with Alabama was this lawsuit.  *See* Def.'s Mot. to Dismiss, Ex. A, Shelton Decl., ¶¶ 8, 10.  Moreover, the deposition and the cease-and-desist letter that Plaintiff relies on make no mention whatsoever of the State of Alabama.  *See* Ex. A, Shelton Dep.; *see also* Compl., Ex. 1, Letter from Basombrio to Shelton (August 22, 2006); Pl.'s Resp., Ex. 3.  Further, the Complaint itself does not contain any allegation that Defendant expressly aimed its conduct at Alabama.  *See* Compl.  Put simply, neither the record nor the law supports Plaintiff's attempt to create personal jurisdiction in Alabama.

### A.  *Alfa Corp. v. Alfagres* is factually distinguishable from this case.

Plaintiff incorrectly attempts to apply the facts of *Alfa Corp. v Alfagres* to this case.  *See* Pl.'s Resp., pp. 8-12 *citing Alfa Corp. v. Alfagres, S.A.*, 385 F. Supp. 2d 1230 (M.D. Ala. 2005).  Moreover, Plaintiff errs in not recognizing that the *Alfagres* court correctly adopted *Calder's* intentionality requirement when applying the effects test.  Plaintiff quoted a portion of the *Alfagres* opinion, but omitted key language whereby the court specified that the allegations against Alfagres indicated that its infringing conduct was specifically directed at Alabama:

> Alfagres ***knew*** it was likely committing trademark infringement specifically against Alfa ***in Alabama*** and continued to do so anyway.  Because it could anticipate that the primary effects of its wrongful conduct would be felt ***in***

---

[2] In its Response, Plaintiff provided only a portion of the deposition taken of Ms. Shelton in a case to which she was not a party.  Defendant attaches to this Reply the entire transcript of that deposition.  *See* Ex. A, Shelton Dep.

> ***Alabama***, Alfagres could reasonably have expected that Alpha [sic] would bring
> suit here, even given Alfagres's [sic] lack of other contacts with Alabama.

385 F. Supp. 2d at 1236 (emphasis added). Thus, in accordance with the court's opinion in
*Alfagres*, the Supreme Court's opinion in *Calder*, and the multitude of authorities applying the
effects test, the non-resident Defendant in this case must have expressly and intentionally aimed
its conduct at Alabama for this Court to exercise personal jurisdiction.

Unlike in *Alfagres*, the intentionality requirement is not satisfied here. Plaintiff points to
the cease-and-desist letter in *Alfagres* to argue that Defendant's receipt of a letter accusing it of
trademark infringement is somehow relevant to personal jurisdiction in Alabama. *See* Pl.'s
Resp., p. 8, *citing Alfagres*, 385 F. Supp. 2d at 1236. However, the letter sent to Defendant (1)
was printed on a letterhead with a California address; and (2) made no mention of the State of
Alabama. *See* Compl., Ex. 1, Letter from Basombrio to Shelton (August 22, 2006); Pl.'s Resp.,
Ex. 3. There is nothing on whatsoever on the face of that letter to put Defendant on notice that
Plaintiff was located in Alabama. Even if it did, "[a] cease and desist letter is not in and of itself
sufficient to establish personal jurisdiction over the sender of the letter." *Yahoo, Inc. v. La Ligue
Contre Le Racisme*, 433 F.3d 1199, 1208 (9th Cir. 2006); *see also Red Wing Shoe Co. v.
Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1361 (Fed. Cir. 1998). Defendant acknowledges
that it received, rather than sent the letter at issue, but in its Response Plaintiff references *Yahoo*
and *Red Wing Shoe* to make the illogical argument that, while the affirmative act of sending a
letter is not sufficient to establish jurisdiction, the passive act of receiving a letter is enough to
support personal jurisdiction. *See* Pl.'s Resp., p. 11. Under Plaintiff's interpretation of the law,
any plaintiff could establish personal jurisdiction in Alabama over any defendant in another state
by merely sending that defendant a letter from Alabama. Such an interpretation flies in the face
of *Calder* and violates due process.

**B.  The July 31, 2006 deposition did not put Defendant on notice that the effects of its conduct would be felt in Alabama.**

Corina Shelton was deposed – in a trademark infringement lawsuit to which she was not a party – in California on July 31, 2006.  *See* Ex. A, Shelton Dep., p. 4.  In Defendant's Motion to Dismiss, Corina Shelton stated that after the deposition she spoke with Juan C. Basombrio, an attorney for Plaintiff.  *See* Def.'s Mot. to Dismiss, Ex. A, Shelton Decl., ¶¶ 7-8.  She specifically testified that Mr. Basombrio "did ***not*** inform me that Alfa Corporation was in any way connected with the State of Alabama."  *See Id.*, ¶ 8 (emphasis added).  In response to Defendant's Motion to Dismiss, Plaintiff submitted the declaration of Mr. Basombrio, whereby he testified that he "*indicated* to Ms. Shelton that [his] client, Alfa Corporation, was a corporation in Alabama…."  *See* Pl.'s Resp., Basombrio Decl., ¶ 3 (emphasis added).   Apparently, Mr. Basombrio's recollection of the conversation differs from Ms. Shelton's.  However, the transcript of the deposition that took place immediately prior to their conversation is absolutely clear – in the entire forty-nine pages of testimony, ***there is not a single mention of the State of Alabama***.  *See* Ex. A, Shelton Dep. (July 31, 2006).  As a result, neither the deposition transcript, the August 22, 2006 letter, nor Corina Shelton's Declaration provide any evidence to suggest that Defendant expressly aimed its conduct at Alabama, or that its conduct might affect any entity within Alabama.  On the contrary, Ms. Shelton specifically testified that she did not know that Plaintiff was in any way connected with Alabama.  Further, the Complaint itself contains no allegation that Defendant expressly aimed its conduct at Alabama.  Accordingly, Plaintiff's argument fails.

**C.  Defendant was not required to investigate whether Plaintiff's business was located in Alabama.**

Plaintiff further argues that, even if Defendant was not aware of Plaintiff's alleged Alabama connections, Defendant "*should have* known the location of [Plaintiff's alleged] injury."  *See* Pl.'s Resp., p. 10 (emphasis added).  However, the legal authority that Plaintiff cites

is inapposite to the facts of this case. *Id.*, *citing Oswalt v. Scripto, Inc.*, 616 F.2d 191 (5th Cir. 1980); *Pollution Prevention Servs., Inc. v. Inter Recycling, Inc.*, 1996 WL 378990 (M.D. Fla. July 1, 1996). In *Oswalt*, the Fifth Circuit found personal jurisdiction appropriate in a products liability case where (1) the defendant delivered millions of cigarette lighters to a co-defendant, with the understanding that the co-defendant would be the exclusive distributor in the United States; (2) the defendant knew that its product would be sold to a nation-wide market; (3) Texas was a state in which the lighters were marketed; and (4) the distribution chain included a Texas wholesaler and a Texas retail store. *Oswalt*, 616 F.2d at 199-200. In *Pollution Prevention Servs.*, the Middle District Court of Florida determined that personal jurisdiction was proper in Florida, for purposes of a breach of contract/fraud claim, when the president of the corporate defendant (1) contacted and met with the plaintiff's president in the State of Florida; and (2) specifically discussed setting up a recycling machine in Florida. 1996 WL 378990 *4.

Unlike *Oswalt* and *Pollution Prevention*, where the courts were presented with ample evidence to establish the minimum contacts necessary to support personal jurisdiction, here there is nothing in the record that establishes any contact at all between Defendant and the State of Alabama. Moreover, neither *Oswalt* nor *Pollution Prevention* analyzed personal jurisdiction under the *Calder* effects test – the relevant test in the Eleventh Circuit. Accordingly, Plaintiff's contention that Defendant should have known that Plaintiff's business had ties to Alabama is without merit.

Assuming *arguendo* that Defendant should have investigated Plaintiff's business, the record shows that Defendant took the reasonable steps necessary to investigate potential trademark issues at the company's inception. When Defendant was incorporated in Indiana, its president – Corina Shelton – conducted a trademark search with the State of Indiana. *See* Ex. A, Shelton Dep., p. 42. Ms. Shelton also registered the domain name for her company with Genesis

– an internet service company located in California – which searched for other companies named "Alfa Mortgage" in its system. *Id.*, pp. 43-44. Ms. Shelton ultimately filed the appropriate papers with the State of Indiana, and Defendant was officially incorporated as Alfa Mortgage on March 20, 2001. *Id.*, p. 12. To suggest that Ms. Shelton was required to do more than this is unreasonable, considering the fact that (1) Plaintiff provides no legal authority to suggest that Defendant was required to perform even these actions; and (2) Plaintiff provides no legal authority to suggest that Defendant's receipt of the August 22, 2006 letter from California triggered a duty to search for trademark conflicts in Alabama or any of the other forty-nine states.[3]

Plaintiff finally contends, without citation to any legal authority, that Defendant should have performed an Internet search on the United States Patent and Trademark Office ("USPTO") website to determine whether the name "Alfa Mortgage" violated Plaintiff's trademark. *See* Pl.'s Resp., p. 9. However, the very evidence that Plaintiff provides in support of this baseless argument shows that had Defendant been obligated to conduct such a search (and it was not), the search would have established that Plaintiff did not register "Alfa" in connection with financial and mortgage services until February 2002 – ***nearly a year after Defendant incorporated Alfa Mortgage on March 20, 2001***.[4] *See* Pl.'s Resp., Ex. 4; Ex. A, Shelton Dep., p. 12. Thus, even if Defendant had performed a USPTO search prior to this lawsuit being filed, there is nothing on that website to indicate to Defendant that it was unlawfully interfering with Plaintiff's trademark in Alabama.

---

[3] For the same reasons, Plaintiff's "deliberate and willful ignorance" argument is without merit. *See* Pl.'s Resp., p. 11.

[4] Plaintiff provides ten "hits" from its own USPTO website search that it claims would have put Defendant on notice of Plaintiff's ownership right to the Alfa trademark. However, nine of those "hits" show that Plaintiff registered for the trademark rights in February of 2002 – *after* Defendant had already incorporated as Alfa Mortgage. The only registration occurring prior to Defendant's incorporation was for Alfa *Insurance*. *See* Pl.'s Resp., Ex. 4, Registration No. 2088673. However, that registration was for the design, words and letters associated with Alfa

**D.  Defendant's website is not enough to establish personal jurisdiction.**

Plaintiff next asserts that Defendant's website, which permits an individual to apply for a loan on-line, suffices to establish personal jurisdiction in Alabama.  *See* Pl.'s Resp., p. 12 *citing Zippo Mfg. Co. v. Zippo Dot Com,* 952 F. Supp. 1119 (W.D. Pa. 1997); *see also Thomas v. Mitsubishi Motor N. Am.*, 436 F. Supp. 2d 1250, 1255 (M.D. Ala. 2006) (stating that "*Zippo* advises that courts should evaluate whether the requisite degree of contact with the forum state exists based on the degree of interactivity of the website"); *Butler v. Beer Across Am.*, 83 F. Supp. 2d 1261, 1268 (N.D. Ala. 2000) (adopting the model set forth in *Zippo* to analyze personal jurisdiction in the context of internet websites).  In *Zippo Mfg. v. Zippo Dot Com,* the Western District Court of Pennsylvania established the following slide scale analysis:

> [T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of the commercial activity that an entity conducts over the Internet.  This sliding scale is consistent with well developed personal jurisdiction principles.  At one end of the spectrum are situations where a defendant clearly does business over the Internet.  If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper.  At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions.  A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise of personal jurisdiction.  The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer.  In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Zippo Mfg. Co.*, 952 F. Supp. at 1124 (internal citations omitted).  The court ultimately concluded that personal jurisdiction was proper in *Zippo* because the defendant had contracted with approximately three thousand Pennsylvania residents over the Internet, and had also entered into agreements with seven Internet access providers in Pennsylvania.  *Id*. at 1125-26.

---

Insurance's logo; and, the registration was associated with "property and casualty insurance underwriting" – not mortgage services.  *Id.*

Unlike the three thousand Pennsylvania residents and seven Pennsylvania access providers that contracted with the defendant over the Internet in *Zippo*, there is not a shred of evidence of Defendant having done any business in Alabama or with an Alabama resident. On the contrary, the evidence in this case establishes that Defendant "does not have, and has never had, any customers in Alabama." *See* Def.'s Mot. to Dismiss, Ex. A, Shelton Decl., ¶ 5. Plaintiff does not refute this, and Plaintiff does not offer any evidence to show that any Alabama resident attempted to apply for a loan via Defendant's website. Applying the sliding scale analysis set forth in *Zippo*, the "level of interactivity" occurring over Defendant's website with Alabama is not sufficient to warrant personal jurisdiction. 952 F. Supp. at 1124.

The United States District Courts in Alabama that have addressed this issue are in accord with this analysis. In *Butler v. Beer Across Am.*, the Northern District held that personal jurisdiction was not proper over a non-resident Illinois defendant that sold beer to an Alabama resident over the Internet. *See Butler*, 83 F. Supp. 2d at 1268. In *Thomas v. Mitsubishi Motor N. Am.*, the Court found that personal jurisdiction did not exist when the defendant's website was not used as a contact with the forum state related to the cause of action. *See Thomas*, 436 F. Supp. 2d at 1254-56. Consequently, Defendant's website in this case is not sufficient to establish personal jurisdiction over Defendant in Alabama. *See also Robbins v. Yutopian Enters.*, 202 F. Supp. 2d 426, 430 (D. Md. 2002) (determining that defendant's acceptance of orders for products over its website was of limited significance because forty-six transactions with forum residents "are not enough to establish general jurisdiction over the defendant…."); *Millennium Enters., Inc., v. Millennium Music, LP*, 33 F. Supp. 2d 907, 921-22 (D. Or. 1999) (finding that a website through which customers could purchase compact discs, request information, and join a discount club was not a basis for personal jurisdiction because no actions were purposefully directed at the forum state); *ESAB Group, Inc., v. Centricut, L.L.C.*, 34 F. Supp. 2d 323, 330 (D.S.C. 1999)

(concluding that a website with on-line order capability did not establish minimum contacts because no action was directed at the forum state); *Origin Instruments Corp., v. Adaptive Computer Sys., Inc.*, 1999 WL 76794 *4 (N.D. Tex. 1999) (noting that a moderate level of interactivity was possible on the defendant's website, but finding that this was not sufficient to establish personal jurisdiction because "there is no evidence in the record to establish that Defendant has been interacting with anyone in Texas through its web site"); *Coastal Video Communs. Corp. v. Staywell Corp.*, 59 F. Supp. 2d 562, 566, 571-72 (E.D. Va. 1999) (stating that neither specific nor general personal jurisdiction was warranted over the nonresident defendant solely on the basis of an interactive website); *Molnlycke Health Care AB v. Dumex Med. Surgical Prods. Ltd.*, 64 F. Supp. 2d 448, 452 (E.D. Pa. 1999) (noting that a small percentage of sales over a web site in the forum state was inadequate to constitute "continuous and systematic business within the forum state").

### II. Even if the Court finds that minimum contacts exist, this Court's exercise of personal jurisdiction over Defendant would offend the traditional notions of fair play and substantial justice.

To determine whether the exercise of jurisdiction comports with fair play and substantial justice, the court considers all of the following factors: (1) the burden on the defendant; (2) the forum state's interest in overseeing the litigation; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interests in efficiently resolving the controversy; and (5) the joint interests of the states in promoting basic social policies. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985) *citing World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1985).

Plaintiff is dismissive of the disparity of resources between itself and Defendant. *See* Pl.'s Resp., p. 13. Plaintiff purports to be a financial services mega-conglomerate, with operations in twenty-four states and "billions of dollars in sales." *See* Compl., ¶¶ 8-11. In

contrast, Defendant is a privately-held company currently consisting of a single employee.  *See* Def.'s Mot. to Dismiss, Ex. A, Shelton Decl., ¶ 3.  The disparity of resources is real, the cost of litigating this action in Alabama is potentially ruinous for Defendant, and this burden is a factor that should be considered by this Court.

Moreover, Plaintiff fails to address Defendant's contention that (1) Indiana and Oregon have, at a minimum, an equal interest in resolving this dispute in their forum's courts; and (2) Plaintiff will be able to pursue the same relief it seeks in those states as it would in Alabama. Further, Plaintiff fails to establish the minimum contacts necessary under the effects test to provide this Court with personal jurisdiction over Defendant.  Accordingly, this Court should find that it does not have personal jurisdiction over Defendant.

## CONCLUSION

This Court does not have personal jurisdiction over the Defendant because Defendant does not have the requisite minimum contacts with the State of Alabama.  The record shows that even under the *Calder* effects test, the minimum contacts requirement is not established because Defendant did not expressly or intentionally aim its conduct at the State of Alabama.  To exercise personal jurisdiction over Defendant in Alabama would offend the traditional notions of fair play and substantial justice.

If Plaintiff has a valid claim against Defendant, it should bring its claim in a forum appropriate for personal jurisdiction.  Alabama is not that forum.  Defendant requests that this Court dismiss this suit for lack of personal jurisdiction.

Respectfully submitted by,


/s/ Bryan A. Coleman_____
Brannon J. Buck        BUC019
Bryan A. Coleman      COL131
Attorneys for Defendant Alfa Mortgage
Corporation


OF COUNSEL:

MAYNARD, COOPER & GALE, P.C.
1901 Sixth Avenue North
2400 AmSouth Harbert Plaza
Birmingham, AL 35203-2618
Telephone: 205.254.1000
Fax: 205.254.1999

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification to the following:

Robert A. Huffaker
Rushton, Stakely, Johnston & Garrett
184 Commerce St.
Montgomery, AL 36104

Juan C. Basombrio
Dorsey and Whitney LLP
38 Technology Dr.
Irvine, CA 92618


/s/ Bryan A. Coleman_____
OF COUNSEL

# In The Matter Of:

*ALFA CORPORATION v.*
*OAO ALFA BANK, et al.*

_____

## CORINA SHELTON
*July 31, 2006*

_____

# LEGALINK MANHATTAN

*420 Lexington Avenue - Suite 2108*
*New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

**SHELTON, CORINA - Vol. 1**



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

--oOo--

ALFA CORPORATION,                )
                                 )
            Plaintiff,           )
                                 )
        vs.                      )Case No.
                                 )04 Civ. 08968 (KMW)
                                 )
OAO ALFA BANK and                )
ALFA-CAPITAL MARKETS (USA),      )
INC.,                            )
                                 )
            Defendants.          )
_____ )


VIDEOTAPED DEPOSITION OF

CORINA SHELTON

_____

Monday, July 31, 2006

Volume I

(Pages 1 - 51)


REPORTED BY:  CYNTHIA A. PACINI, CSR #6117, RMR, CRR

(03-384235)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

---

**Page 2**

1              I N D E X
2       INDEX OF EXAMINATIONS
3                    Page
4   EXAMINATION BY MS. CRADDOCK ................... 5
5   EXAMINATION BY MR. BASOMBRIO................... 41
6   FURTHER EXAMINATION BY MS. CRADDOCK ........... 47
7   FURTHER EXAMINATION BY MR. BASOMBRIO .......... 47
8
9       EXHIBITS MARKED FOR IDENTIFICATION
10  No.         Description              Page
11  1     Four-page document titled ........... 7
            "Subpoena in a Civil Case"
12
      2     Multi-page document titled .......... 11
13      "Certificate of Incorporation of
            Alfa Mortgage, Incorporated"
14
      3     One-page document titled ............ 20
15      "Alfa Mortgage, Inc."
16  4     One-page computer printout headed ... 24
            "Apply For a Loan"
17
      5     Two-page computer printout .......... 26
18      headed "New User Sign Up"
19
20
21
22
23
24
25

---

**Page 3**

1       UNITED STATES DISTRICT COURT
2       SOUTHERN DISTRICT OF INDIANA
3                --oOo--
4   ALFA CORPORATION,            )
                                 )
5        Plaintiff,    )
                                 )
6        vs.              )Case No.
                  )04 Civ. 08968 (KMW)
7                                )
    OAO ALFA BANK and            )
8   ALFA-CAPITAL MARKETS (USA),   )
    INC.,                    )
9                                )
         Defendants.    )
10  _____)
11
12           --oOo--
13      BE IT REMEMBERED that pursuant to Subpoena
14  and on Monday, July 31, 2006, commencing at 10:19
15  a.m. thereof, at the Law Offices of Jones Day, 555
16  California Street, 26th Floor, San Francisco,
17  California, before me, Cynthia A. Pacini, a
18  Certified Shorthand Reporter, Registered Merit
19  Reporter and Certified Realtime Reporter, personally
20  appeared
21          CORINA SHELTON
22
23  called as a witness by the Defendants, who, having
24  been first duly sworn, was examined and testified as
25  follows:

---

**Page 4**

1                --oOo--
2       DORSEY & WHITNEY, LLP, 38 Technology
3   Drive, Irvine, California 92618-5310, represented by
4   JUAN C. BASOMBRIO, Attorney at Law, appeared as
5   counsel on behalf of the Plaintiff.
6       JONES DAY, 222 East 41st Street, New York,
7   New York 10017-6702, represented by CLARK CRADDOCK,
8   Attorney at Law, appeared as counsel on behalf of
9   the Defendants.
10      Also Present:  GRETCHEN VOGEL-Videographer
11          P R O C E E D I N G S
12      THE VIDEO OPERATOR:  Good morning.  This
13  is Gretchen Vogel of LegaLink Action Video, 420
14  Lexington Avenue, New York, New York.  Today's date
15  is July 31st, 2006.  The time on the video monitor
16  is 10:19 a.m.  The offices we are at are Jones Day
17  at 555 California Street, San Francisco, California.
18  Case, Alfa Corporation versus OAO, case number
19  04-CIV 8968 (KMW) to take the video deposition of
20  Corina Shelton, District Court for the Southern
21  District of New York.  The court reporter today is
22  Cindy Pacini of LegaLink, San Francisco.
23      Will the counsel please introduce
24  themselves?
25      MS. CRADDOCK:  I'm Clark Craddock from

---

**Page 5**

1   Jones Day New York, and I represent the defendants
2   OAO Alfa Bank and Alfa Capital Markets, Inc.
3       MR. BASOMBRIO:  I'm Juan Basombrio, Dorsey
4   & Whitney, for plaintiff Alfa Corporation.
5       THE WITNESS:  Corina Shelton, president of
6   Alfa Mortgage, Incorporated.
7       THE VIDEO OPERATOR:  Thanks.  Would the
8   court reporter please swear in the witness?
9       (Whereupon, the witness was sworn.)
10      THE WITNESS:  I do.
11        EXAMINATION BY MS. CRADDOCK
12      MS. CRADDOCK:  Q.  Thank you for coming.
13  Could you just please state your name and address
14  for the record, please?
15      A.  Yes.  My name is Corina Shelton.  My
16  address is 4272 Terrabella Way, Oakland, California
17  94619.
18      Q.  And also for the record, I want to make
19  sure that you understand you had the right to have
20  your attorney present at this deposition.
21      A.  Yes.
22      Q.  Okay.  Thank you.  Have you ever been
23  deposed before?
24      A.  No.
25      Q.  All right.  I'm going to just sort of step

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

Page 6

1  you through the process.
2      A.  Okay.
3      Q.  What it is today, you're going to be here
4  to testify on behalf of Alfa Mortgage, Incorporated,
5  and I will ask you questions.  You're under oath to
6  answer them as truthfully and as accurately as
7  possible?
8      A.  Okay.
9      Q.  Okay.  It's important because the court
10 reporter is making a written record of what we're
11 saying today that you answer orally rather than
12 nodding or shaking your head.  All right?
13     A.  Okay.
14     Q.  If you need to take a break for any
15 reason, just let me know, and we can take a break at
16 any time.
17         If you don't understand a particular
18 question that I've asked, if you'll just tell me
19 that you'd like me to restate the question, I'll be
20 more than happy to do that.
21     A.  Okay.
22     Q.  Okay.  And also if at some later point in
23 the deposition, you happen to remember part of an
24 answer to a question that was asked before and you
25 would like to supplement your answer, you can feel

Page 7

1  free to remind me that you'd like to go back to that
2  question --
3      A.  Okay.
4      Q.  -- and supplement your answer.  That's not
5  a problem.
6          I'd like the court reporter to mark this
7  first exhibit as Shelton one, please.
8          (Whereupon, Shelton Exhibit 1 was marked
9           for identification.)
10     MS. CRADDOCK:  Q.  If you could just look
11 at this exhibit, Ms. Shelton.  Have you seen this
12 document before?
13     A.  Yes, I have.
14     Q.  Okay.  So you understand that if you turn
15 to the third page, that this subpoena was requesting
16 that you produce documents about these topics below?
17     A.  Yes.
18     Q.  And you have produced documents in
19 response to that request?
20     A.  Yes.
21     Q.  And if you turn to the next page,
22 Schedule B, you understand that you're here as a
23 corporate representative of Alfa Mortgage,
24 Incorporated --
25     A.  Yes.

Page 8

1      Q.  -- to answer and address these issues?
2      A.  Yes.
3      MR. BASOMBRIO:  I want to the object to
4  the entirety of the deposition because none of the
5  documents produced pursuant to the subpoena were
6  turned over to us despite our request before the
7  deposition began.
8      MS. CRADDOCK:  And I'd like the record to
9  reflect that Ms. Shelton brought those documents to
10 us this morning when she came for her deposition.
11     MR. BASOMBRIO:  Those are all the
12 documents you produced at once today?
13     THE WITNESS:  Yes, that's all.
14     MR. BASOMBRIO:  All right.  Then I have
15 those.
16     THE WITNESS:  Okay.
17     MS. CRADDOCK:  Q.  Could you please give
18 me your educational background since high school?
19     A.  Basically high school is what I completed.
20 I don't have any degrees further than that.
21     Q.  Okay.
22     A.  I went to school in Portland, Oregon, took
23 college courses there, but never --
24     Q.  Okay.  What was your job experience after
25 high school?

Page 9

1      A.  I started working at U.S. Bank in Portland
2  in '89 as a bank teller, and then I went on to work
3  with customer service and do home loans as far as
4  equity and car loans.  And so that's kind of how I
5  got into the lending side.
6      Q.  And then after -- how long did you work at
7  U.S. Bank?
8      A.  For about five years or so.  And then I
9  worked with a start-up commercial bank, Northern
10 Bank of Commerce, and was doing loans there as well
11 and customer service, and then I got into some real
12 estate after that and started brokering loans
13 shortly after.
14     Q.  When did you begin working at Northern
15 Bank?
16     A.  Northern Bank of Commerce.  I don't have
17 the exact dates because I don't have my resume in
18 front of me, but it was probably somewhere in, I
19 would say, '95 --
20     Q.  Okay.
21     A.  -- roughly.
22     Q.  And how long did you work there?
23     A.  I worked there for two years.
24     Q.  And after you left there, you worked
25 where?

3 (Pages 6 to 9)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

Page 10

1    A.  I actually did medical sales for a short
2  while and then I started working with Century 21 as
3  a real estate agent.
4    Q.  When did you begin working at Century 21,
5  do you remember?
6    A.  Probably in maybe '96.
7    Q.  And how long did you work there?
8    A.  Not very long.  Maybe like six months.
9  Did not like it.
10    Q.  And where did you work after Century 21?
11    A.  I worked with Majestic Mortgage out of
12  Portland, Oregon.
13    Q.  And how long did you work with Majestic
14  Mortgage?
15    A.  I worked with Majestic probably for a
16  couple years as well.
17    Q.  And those years would have been?
18    A.  From like '97 roughly to maybe '99.
19    Q.  Okay.  And then your next --
20    A.  Then I worked with Accredited Home Loans
21  as a lender rep, and I worked with them until about
22  2000, and then in 2000 is when I moved to Indiana,
23  at the end of 2000 and started Alfa in March of
24  2001.
25    Q.  And you are currently employed by Alfa?

Page 11

1    A.  I am.
2    Q.  And your position is?
3    A.  President.
4    Q.  And you understand that when I say Alfa, I
5  mean Alfa Mortgage?
6    A.  Alfa Mortgage, Incorporated.
7    Q.  Thank you.  And what are your current
8  responsibilities as president?
9    A.  Taking care of all the office.  I don't
10  have -- it's a very small brokerage, so basically
11  anything that has to do with Alfa Mortgage I take
12  care of.  So, you know, payrolls, and originating
13  mortgage loans.
14    Q.  Anything else?
15    A.  Taking care of issues like this.
16    Q.  Do you make decisions about the promotion
17  of the company?
18    A.  I do.
19    Q.  How long have you been president of Alfa?
20    A.  Since March of 2001.
21    MS. CRADDOCK:  I'll ask the court reporter
22  to mark this exhibit as Shelton 2, please.
23    (Whereupon, Shelton Exhibit 2 was marked
24    for identification.)
25    MS. CRADDOCK:  Q.  These documents are the

Page 12

1  documents that you produced to us this morning; is
2  that correct?
3    A.  Yes.
4    Q.  Could you please go through each page and
5  explain what each one of these documents is?
6    A.  The first page of this is a certificate of
7  incorporation showing when the company was
8  incorporated, March 20th of 2001.
9    Q.  Okay.
10    A.  And the second page would be the articles
11  of incorporation again stating -- showing when the
12  company, Alfa Mortgage, Incorporated, was
13  incorporated on the 20th of March, 2001.  And the
14  third item then will show also the licensing, when
15  we licensed as a mortgage broker for Alfa Mortgage.
16    Q.  Is there a date on this document?
17    A.  I don't know if there is.  It's dated, but
18  I can't really see it because it's -- it looks to me
19  like it may have been dated the 25th.
20    Q.  The 25th of?
21    A.  Of March.  And it would have been 2001.
22  And then the next items basically show the board of
23  directors, that I am president, secretary,
24  treasurer.  I'm the sole shareholder of Alfa
25  Mortgage, Incorporated, and that's basically all the

Page 13

1  rest of the documents show.
2    Q.  Okay.  Are you still the sole shareholder
3  of Alfa Mortgage, Incorporated?
4    A.  Yes, I am.
5    Q.  How did you choose the name Alfa Mortgage,
6  Incorporated?
7    A.  Well, choosing a name is tough because
8  you're always thinking of what you're going to start
9  a company with.  And I was sitting there one day
10  thinking of Alfa and in my country, in Romania, an
11  Alfa is the beginning, which is in a lot of -- we
12  all know as Alfa.  So it's a beginning.  And I
13  wanted an A name.  For advertising purposes, you
14  want to be at the beginning, and so that's where I
15  came up with Alfa.
16    Q.  How did you choose the spelling?
17    A.  Well, that's the way that we spell it is
18  A-l-f-a.  And at the time I was actually going to
19  expand on that and make each letter stand for
20  something.  And so I was thinking of it like
21  appreciation, loyalty, fulfillment, achievement, and
22  then I was going to go from that, but I never did
23  much with that.
24    Q.  Have you always used the name Alfa
25  Mortgage, Incorporated?

4 (Pages 10 to 13)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

Page 14

1    A.  Yes.
2    Q.  When you started Alfa in March of 2001,
3  what products did you offer or services?
4    A.  It was mortgage loans, so home loans for
5  purchase or refinance.
6    Q.  Any other products or services at that
7  time?
8    A.  No.
9    Q.  Okay.  When did you begin offering
10  mortgages?
11    A.  At -- in 2001 when the company started.
12    Q.  In March of 2001?
13    A.  Um-hum.
14    Q.  Did you have an office at that time?
15    A.  I was working out of my home.
16    Q.  And where was that?
17    A.  At -- I think it's 10456 Power Drive in
18  Carmel.
19    Q.  Carmel?
20    A.  Indiana, 46033.
21    Q.  How many employees did you have there?
22    A.  It was just myself and then I hired a
23  processor shortly after.  So there was two.
24    Q.  What was the processor's duties?
25    A.  All she was doing was inputting files and

Page 15

1  filing and organizing paperwork.  She didn't have
2  any contact with customers.
3    Q.  Okay.  And when did you hire her, do you
4  remember?
5    A.  Roughly at the end of '01, maybe beginning
6  of '02.
7    Q.  Did you do advertising when you first
8  began?
9    A.  I did.
10    Q.  What kind of advertising?
11    A.  I was running my ads in the Indianapolis
12  paper, the Star.  I was running my rates in the
13  mortgage table.
14    Q.  How often would you run those ads?
15    A.  Every Sunday.
16    Q.  When did you start running that ad?
17    A.  Shortly after I started the company, so
18  maybe June of '01.
19    Q.  Where in the paper would the ads have been
20  printed?
21    A.  They were in the mortgage table of the
22  Indianapolis Star.
23    Q.  Did you do any other sort of advertising?
24    A.  No.  Pretty much that was our main source
25  of advertisement aside from, you know, sending out

Page 16

1  some flyers.  We did some mailers.  And that's about
2  it.
3    Q.  Did you have cards?
4    A.  Business cards?
5    Q.  Yes.
6    A.  Yes.
7    Q.  Did you have stationery with the name Alfa
8  Mortgage?
9    A.  Yes.
10    Q.  Your business cards also had --
11    A.  Yes.
12    Q.  -- the name Alfa Mortgage?
13    A.  Um-hum.  And we had pens and Post-It notes
14  and --
15    Q.  What other sorts of things?
16    A.  T-shirts.  I'm trying to think of what
17  else.  Water bottles.  I'm sure we had other
18  marketing things.  I can't think of exactly what we
19  had.
20    Q.  Who would you give these items to?
21    A.  We would give them to prospect customers.
22  We had -- you know, we did some events, like having
23  a booth at -- one of the ones that we did a few
24  years in a row was at 24-Hour Fitness.  Every year
25  they had tables and some insurance companies, and I

Page 17

1  was the mortgage company that was there.  Basically
2  we spent an entire day just passing out flyers to
3  health members.
4    Q.  24-Hour Fitness was located where?
5    A.  Not 24-Hour Fitness.  Lifetime Fitness.
6  I'm sorry.
7    Q.  Lifetime, where is that located?
8    A.  It's in Indianapolis, Indiana.  There's
9  only one location there.
10    Q.  How would you distribute your flyers?
11    A.  Handed them out.
12    Q.  Out at events such as --
13    A.  At events, like we did the Home and Garden
14  Show and -- so --
15    Q.  The Home and Garden Show was also in
16  Indianapolis?
17    A.  Yes, like the Home Improvement.  That was
18  in Indiana.  Yes.  We did one of those shows, I
19  think, in 2003.
20    Q.  Do you remember when you did the Lifetime
21  Fitness event?
22    A.  I think I did one in 2003 and maybe 2004.
23  We did it two years in a row, so it was either '02
24  and '03 or '03 and '04.
25    Q.  Did you do any other sorts of events?

5  (Pages 14 to 17)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

Page 18

1    A.  No, we didn't.
2    Q.  Did you have a budget that you -- for your
3  advertising and promotion?
4    A.  We didn't really.  We just kind of
5  budgeted, at the time, that something came up.  We
6  had other sources of advertisement that we did when
7  it came to -- we did a few golf outings and, you
8  know, donated money to fundraising events that they
9  would then put our name in their advertisements.
10    Q.  Would you also distribute some of these
11  promotional items at the golf outings and the Home
12  and Garden show?
13    A.  Sometimes we would.  It just all depended
14  on -- at the Home and Garden Home Improvement show,
15  absolutely we did.
16    Q.  So you've stated that you first began
17  business in Indianapolis.  Did you subsequently
18  expand your business to include other places?
19    A.  Yes.  I licensed in Portland, Oregon, and
20  then also in California, I reserved -- I was going
21  to start out here, haven't officially finished that,
22  but -- and then we were licensed in Minnesota for
23  awhile and also I had started in Illinois and the
24  process and we got halfway through and then backed
25  out.

Page 19

1    Q.  Are there any other places that you've
2  been licensed in?
3    A.  No.  I mean the only places I've ever been
4  bonded -- licensed and bonded in was Indiana,
5  Minnesota, Oregon, California and Illinois.
6    Q.  Are you still currently licensed in
7  Indiana?
8    A.  In Indiana, I am.
9    Q.  When did you become licensed in Portland?
10    A.  Oh, maybe 2002.
11    Q.  Are you still currently licensed in
12  Portland?
13    A.  I'm still currently bonded, and I am in
14  the process of renewing my licensing there.
15    Q.  Okay.  Just to clarify:  You're currently
16  in the process of becoming licensed in California?
17    A.  Well, I started the whole licensing here
18  as far as, you know, getting the name registered and
19  that's as far as I got.
20    Q.  Okay.  In Minnesota, you're -- when did
21  you become registered?
22    A.  I believe in 2003.
23    Q.  And are you currently registered?
24    A.  We are registered.  I don't believe we're
25  bonded there anymore.

Page 20

1    Q.  When were you registered in Illinois?
2    A.  Around the same -- 2003.
3    Q.  And you're not currently registered in
4  Illinois; is that correct?
5    A.  No.
6    Q.  For these other states, did you also do
7  promotional activities in those states?
8    A.  No.
9    Q.  No.  What products and services do you
10  currently offer?
11    A.  Any -- a wide range of home loans, so from
12  first mortgages, second mortgages, home equities,
13  lines of credits, purchases, refinances.
14    Q.  Anything else?
15    A.  Well, anything that has to do with a home
16  mortgage.
17    MS. CRADDOCK:  Could you mark this Exhibit
18  Shelton 3, please.
19    (Whereupon, Shelton Exhibit 3 was marked
20    for identification.)
21    MS. CRADDOCK:  Q.  Do you recognize this
22  document?
23    A.  Yes, I do.  It's off of our website.
24    Q.  Okay.  And could you tell me what this
25  particular page of your website is intended to do?

Page 21

1    A.  Basically just shows two customers, or
2  whoever, it has all kinds of loans that we can do.
3    Q.  So when you stated before any sort of loan
4  that's associated with mortgages, is this the sort
5  of loans?
6    A.  This is, yes.
7    Q.  Is this a comprehensive list of the
8  products that you currently offer?
9    A.  It pretty much is, yeah.
10    Q.  By pretty much, are there others that
11  aren't listed here?
12    A.  No, I don't see any that wouldn't -- that
13  are not.
14    Q.  Okay.  Are there loans that are listed
15  here that you don't currently offer?
16    A.  No, there aren't.
17    Q.  Okay.  Thank you.  Do you have additional
18  offices?
19    A.  No.
20    Q.  Do you still have your office in
21  Indianapolis?
22    A.  I do.
23    Q.  How many employees does Alfa Mortgage
24  currently have?
25    A.  Currently it's just myself and one other

6 (Pages 18 to 21)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

Page 22

1 employee.
2    Q.   What's that employee do?
3    A.   Just originates home loans.  Loan officer.
4    Q.   So they do interact with clients?
5    A.   They interact with clients, yeah.
6    Q.   And where are they located?
7    A.   In Indianapolis, Indiana.
8    Q.   Who is that employee?
9    A.   Eric Iacabozzi.
10    Q.   Could you spell his last name, please?
11    A.   I-a-c-a-b-o-z-z-i.
12    Q.   Does he have cards with Alfa Mortgage?
13    A.   Yes, he does.
14    Q.   Does he have letterhead with the company's
15 name?
16    A.   Yes, he does.
17    Q.   We may have already covered this, but
18 could you tell me what your current promotional
19 activities are for Alfa Mortgage?
20    A.   As far as what we do for advertisements?
21    Q.   Yes.
22    A.   We still currently just do mailers as far
23 as send out flyers.  We haven't done any newspaper
24 advertisements probably for about a year at least.
25 So that's really telemarketing calls and mailers.

Page 23

1    Q.   How do you get the names for your mailers?
2    A.   I have purchased, you know, lists of names
3 from lead companies and same as if, you know, for
4 telemarketing calls.  We've done that as well.  And,
5 you know, a lot of it is past clients that we have.
6    Q.   Do you still distribute the promotional
7 items that you had mentioned before?
8    A.   We do.  We distribute those, you know, to
9 customers we have at closings.  We give a pen out
10 or, you know, Post-Its.  And if for some reason I
11 make a call to an office, I will drop things off
12 like to a real estate office or --
13    Q.   So you work with particular real estate
14 offices as well?
15    A.   We have some realtors that we work with
16 and then we've had some, you know, builders that
17 we've worked with that we will distribute items to
18 their offices.
19    Q.   Where are these realtors and builders
20 located?
21    A.   In Indiana.
22    Q.   Where in Indiana?
23    A.   Mostly in Indianapolis.
24    Q.   But where else?  You say mostly, so --
25    A.   Well, I mean, we have, you know, if we

Page 24

1 have a relationship in Avon or if we have it -- I
2 mean, we will distribute items and drop something
3 off no matter where we go, so --
4    Q.   How many of these relationships do you
5 have?
6    A.   Well, our largest relationship is one of
7 the CP Morgan, which is a big builder in
8 Indianapolis, Indiana.  So some of the sales
9 counselors there will receive information.  And then
10 it just depends on, you know, if the loan officer
11 has a relationship with someone or they get a new
12 contact, they will go and meet the person and --
13    Q.   Do you have an estimate of how many
14 offices that you distribute your material to?
15    A.   No, I don't.
16       MS. CRADDOCK:  Could you mark this Shelton
17 Exhibit 4, please.
18       (Whereupon, Shelton Exhibit 4 was marked
19        for identification.)
20       MS. CRADDOCK:  Q.  Do you recognize this
21 page?
22    A.   Um-hum.  That's off of our website as
23 well.
24    Q.   And what is this page?
25    A.   It's -- if a borrower wants to apply

Page 25

1 online, they go in and put an application.
2    Q.   Have you had borrowers apply online?
3    A.   Yes, we have.
4    Q.   Approximately how many?
5    A.   Oh, actually quite a few.  I don't have a
6 number.
7    Q.   More than ten?
8    A.   Oh, more than ten, definitely.
9    Q.   More than 20?
10    A.   More than 50.
11    Q.   More than 50.  Could you explain to me how
12 this process would work for applying for a loan on
13 line?
14    A.   Yes.  You would go in and you would
15 register and apply online and then once the
16 application is submitted, we are notified via e-mail
17 that an application has come into our website, and
18 we download the application into our database and
19 then basically we contact the borrowers that we
20 received their application.
21    Q.   And then what happens next?
22    A.   Then we start the loan process if we agree
23 on terms.
24       MS. CRADDOCK:  Would you mark this Shelton
25 Exhibit 5?

7 (Pages 22 to 25)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

Page 26

1     (Whereupon, Shelton Exhibit 5 was marked
2     for identification.)
3     MS. CRADDOCK:  Q.  Ms. Shelton, do you
4  recognize this page?
5     A.  No.  Is that on our website?
6     Q.  Yes.
7     A.  Oh.
8     Q.  I'll represent to you that if I click on
9  "new user sign up" --
10    A.  Okay.
11    Q.  -- this is the page that comes up?
12    A.  This comes up.  Okay.  They've made some
13  changes to the site, so some of the screens have
14  changed just with the updates of the website.  So --
15    Q.  One of the things that I noticed about
16  this page is in the center of the page, state.
17    A.  Um-hum.
18    Q.  There's a pull-down menu --
19    A.  Okay.
20    Q.  -- where you can select the state.
21    A.  Um-hum.
22    Q.  How does that work for the states for
23  which you're licensed?
24    A.  Well, I'm assuming that the pull-down is
25  if a borrower's applying online from another -- you

Page 27

1  know, depends on where they're applying from.
2     Q.  Okay.
3     A.  So that's what -- that pull-down is going
4  to be there as a default.
5     Q.  Do you get applications from individuals
6  applying from --
7     A.  I have had roughly -- I've had a couple
8  which -- some individuals applying from Texas, which
9  we don't do loans in Texas.
10    Q.  Okay.
11    A.  And I would say that that's probably the
12  only state that we've ever had.
13    Q.  Okay.  Thank you.  When did you put your
14  website on the Internet?
15    A.  Well, it was on the Internet -- the
16  website was in existence probably sometime in 2001,
17  and then we did some changes to it back in 2003, but
18  it's been on the Internet since '01.
19    Q.  What sort of changes in 2003?
20    A.  We just updated the site.
21    Q.  Do you have a means for tracking how many
22  hits or how many visitors you have to your site?
23    A.  No.
24    Q.  Do people contact you by e-mail because of
25  your site?

Page 28

1     A.  Sometimes they do.
2     Q.  Do you use any other sites to refer people
3  to your website?
4     A.  No.
5     Q.  No.
6     A.  I will go back to that.  I have with SBC,
7  the online Yellow Pages, I know that if you went to
8  that, I believe that there is a link to our site
9  from that.
10    Q.  Okay.
11    A.  And I know it was like that in the past.
12  I'm not sure exactly if it's still that way.
13    Q.  Okay.
14    A.  So that would be the only other source as
15  far as online where somebody could have gone through
16  a different site to access our web.
17    Q.  Do any of the realtors or builders that
18  you have relationships with provide links to your
19  website?
20    A.  No.
21    Q.  In those relationships, do those builders
22  or realtors, do they refer people to you?
23    A.  Yes.
24    Q.  Yes?
25    A.  Um-hum.

Page 29

1     Q.  How many referrals do you get
2  approximately a month from --
3     A.  Oh, probably two, three.
4     Q.  Okay.
5     A.  I mean, it could be more.  Depends on --
6     Q.  Could you explain a little bit about once
7  someone applies for a loan with you, what the next
8  steps are in finding a mortgage for them?
9     A.  Well, once somebody applies for a loan, we
10  have to establish their credit strength.  So, you
11  know, we look at their credit history.  We need to
12  find out what kind of loan they're looking for.  Are
13  they buying something?  Are they -- and, you know,
14  from that point forward, we collect their income
15  documentation, send what we need to preapprove them,
16  and go from there.  So --
17    Q.  And then what happens next though?
18    A.  Then we submit their files, once we agree,
19  okay, this is what they want.  We submit the files
20  to a lender, an investor of ours, for approval.
21    Q.  Do you use more than one lender?
22    A.  Yes, we do.
23    Q.  How many lenders do you use?
24    A.  Oh, we have probably 50 lenders or more.
25  We have access to a lot of lenders.

8 (Pages 26 to 29)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

Page 30

1    Q.  How do you have access to a lot of
2  lenders?
3    A.  Well, anybody that's on the -- wholesales
4  mortgage loans, we have access to use.
5    Q.  I'm sorry.  Can you explain what wholesale
6  mortgage loans --
7    A.  As far as Bank of America, for instance,
8  they have a wholesale department which we broker our
9  loans through their wholesale.  That's what the
10  wholesale -- they have retail that they originate
11  their own in-house loans through, and then they also
12  wholesale, which the brokers use the wholesale side.
13  And all the investors are like that.
14    Q.  There's a website, a wholesale --
15    A.  No.  There's no websites, no.
16    Q.  So how do you -- how did you develop
17  relationships with these lenders?
18    A.  They walk in and drop their flyers off
19  most of the time or they call you.  You get ten
20  calls a day from them sometimes.  So that's how you
21  establish relationships.
22        A lot of it is word of mouth.  You hear
23  from other brokers.  These lenders offer these great
24  programs or this one's got that.  This one's got
25  that.  And then you hear that and then you get sent

Page 31

1  information every day from investors.
2    Q.  So they're soliciting?
3    A.  They're soliciting.
4    Q.  And how are they aware of you and your
5  company?
6    A.  They probably find out from the Secretary
7  of State who is licensed and so a lot of it maybe is
8  that way, as well as word of mouth again from other
9  brokers or networking events where you meet some of
10  these investors and lenders.
11    Q.  Can you tell me about these networking
12  events?
13    A.  In Indiana, they have a networking night
14  once a month where realtors and builders and
15  mortgage professionals get together and basically
16  network.  And then we also have, you know, like the
17  mortgage conferences once a year in Indiana.
18  There's golf outings that happen with the
19  Association of Mortgage Brokers.  And it's probably
20  one of the biggest networking between realtors and
21  mortgage brokers.
22    Q.  The Association of Mortgage Brokers is?
23    A.  Um-hum.
24    Q.  How many attend these --
25    A.  Oh, quite a few.  Hundreds.

Page 32

1    Q.  Hundreds.  Are these yearly gatherings?
2    A.  Yearly gatherings, yeah.  They have
3  monthly networking events which maybe you get 50, 60
4  brokers.
5    Q.  Was that the networking night that you --
6    A.  That was the networking night.
7    Q.  Do you distribute your promotional
8  materials at any of these events?
9    A.  Oh, just business cards usually.
10    Q.  Do you belong to any other professional
11  associations?
12    A.  No.  We were members of the Chamber,
13  Better Business Bureau, but I believe those have
14  expired, and I don't know if we renewed.
15    Q.  Okay.  Do you attend any other trade
16  shows?
17    A.  No.  I mean, I attend trade shows.  I
18  attend the mortgage brokers trade shows and usually
19  like the home improvement shows.
20    Q.  For the Association of Mortgage Brokers,
21  is that meeting just in Indiana?  Is this the group
22  in Indiana or is it all?
23    A.  Well, they have a national one, but in
24  Indiana, they have the Indianapolis Association of
25  Mortgage Brokers that have the networking events.

Page 33

1    Q.  Do you attend both?
2    A.  Yes.
3    Q.  How long have you attended both?
4    A.  Oh, well, in Indiana just since I've been
5  there from 2001, but the other ones, the national
6  broker conventions and events I've attended since
7  '90.
8    Q.  Do you attend every year?
9    A.  Yes.
10    Q.  Are there any other networking events that
11  you attend?
12    A.  No.
13    Q.  You said before that you have
14  relationships with approximately 50 lenders?
15    A.  Um-hum.
16    Q.  Can you -- can you name a few of these
17  lenders, some of the larger lenders?
18    A.  Yeah.  Like Wells Fargo, Citibank,
19  National City, Accredited Home Lenders.  I don't
20  know how many you want me to name, but --
21    Q.  Just some of the larger banks.
22    A.  Okay.  Like Fremont Investments,
23  Countrywide, Washington Mutual.
24    Q.  Are these banks that you've used since
25  Alfa Mortgage has begun?

LEGALINK, A MERRILL CORPORATION
(800) 325-3376        www.Legalink.com

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

Page 34

1    A.  Yes.
2    Q.  Are most of your lenders lenders that
3 you've had relationships with since the beginning of
4 Alfa Mortgage?
5    A.  Yes.
6    Q.  Do they ever have promotional events that
7 you attend?
8    A.  No, not -- I don't usually attend any of
9 their events.  Once in a while they do and, you
10 know, training, seminars or -- I have attended
11 those.
12    Q.  Um-hum.  You attend those as a
13 representative of Alfa Mortgage?
14    A.  Yes.
15    Q.  Would you like to take a short break?
16    A.  No.  It's fine.
17    Q.  Do you have a target market for your
18 clients?
19    A.  The entire state of Indiana is a target
20 market.
21    Q.  Have you made loans -- have you made loans
22 in areas other than, say, the metropolitan area of
23 Indianapolis?
24    A.  Yes.
25    Q.  Where else?

Page 35

1    A.  I can't say from the top of my head where,
2 but I mean like two, three hours out of Indiana,
3 we've made loans.
4    Q.  When you were licensed in other states,
5 were you successful in making loans there?
6    A.  No.  One of the only states that we really
7 were originating out of is Oregon.
8    Q.  Oregon?
9    A.  Yeah.
10    Q.  And you made loans?
11    A.  We made loans in Oregon.
12    Q.  What was the time period that you were
13 making loans in Oregon?
14    A.  Probably two, three years.
15    Q.  Two or three years -- let's see -- and I
16 have that you began mortgage lending in Oregon in
17 2002?
18    A.  '02, um-hum.
19    Q.  Do you have any plans to expand your areas
20 of operation?
21    A.  No, I don't.  Just in Indianapolis I had
22 purchased an office building about a year ago, so
23 I've been doing a lot of renovating to that and have
24 been planning on expanding that office with more
25 employees.

Page 36

1    Q.  But you aren't planning to expand to other
2 states?
3    A.  No.  Possibly in Oregon as well and -- I
4 mean, I had plans of expanding in California, but I
5 also need the time to do all of my educational
6 requirements and everything, so --
7    Q.  Okay.
8    A.  -- that's one of the reasons for my delay
9 here.
10    Q.  Do you have plans to expand the products
11 that you offer in Indiana?
12    A.  No, I do not.
13    Q.  Could you tell me approximately how many
14 mortgages you service in 2005?
15    A.  Well, we don't service any of our
16 mortgages because they're all serviced by --
17    Q.  The lenders?
18    A.  -- our investors, correct.
19    Q.  How many mortgages did you -- would the
20 correct term be originate?
21    A.  Maybe 50.
22    Q.  50.  And how many in 2004?
23    A.  Oh, probably maybe 100.
24    Q.  In 2003?
25    A.  At least the same.

Page 37

1    Q.  100?
2    A.  I don't have the numbers, but it would be
3 at least that.
4    Q.  Does your employee also attend these
5 professional organizations --
6    A.  Yes.
7    Q.  -- and associations?  Are there any
8 additional networking events he attends that you
9 don't?
10    A.  No, not that I can think of.  I mean, he's
11 welcome to attend any networking events he wants,
12 but I don't know what he does.
13    Q.  Have you ever done any radio promotion?
14    A.  No.
15    Q.  Any television promotion?
16    A.  No.
17    Q.  Had you ever heard of Alfa Corporation?
18    A.  No.
19    Q.  Prior to this, have they contacted you?
20    A.  No.
21    MS. CRADDOCK:  No.  Okay.  I'd like to
22 take about a five-minute break.
23    THE VIDEO OPERATOR:  Off the record.  The
24 time is 11:05.
25    (Recess taken.)

10 (Pages 34 to 37)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

Page 38

1    THE VIDEO OPERATOR: On the record. The
2 time is 11:11.
3    MS. CRADDOCK: Q. I just have a few more
4 questions for you.
5    A. Okay.
6    Q. When you're processing someone's loan
7 application, do you subscribe to any services as far
8 as how to determine their credit rating?
9    A. Yes. I have a company that we use to pull
10 their credit through, which is Associated Credit out
11 of Medford, Oregon.
12    Q. And that's a service you subscribe to?
13    A. That's a service that we pay for.
14    Q. And have you used them since Alfa Mortgage
15 began?
16    A. Since I -- yes.
17    Q. Are there any other sorts of services you
18 subscribe to as a corporation?
19    A. Yes. Our origination software that we use
20 which we can run our approvals through that does
21 underwriting through our investor sites, et cetera,
22 is with Genesis, and they're out of California.
23    Q. Okay.
24    A. Encompass the same thing. I remembered --
25 I believe I gave you the address from where I opened

Page 39

1 Alfa was -- it was 10560 Power, not 10450.
2    Q. Is that also your current office address?
3    A. No. That was my home address at the time
4 and then I leased an office space out of the 8888
5 Keystone Crossing, which is currently the address
6 that we still use.
7    Q. And when did you lease that office?
8    A. Probably in 2002.
9    Q. In 2002?
10    A. Um-hum.
11    Q. Do you have a sign in the front of your
12 office?
13    A. No. It's in a tall building like this, so
14 you can't put a sign.
15    Q. Out front. Is there a sign on the door?
16    A. There's a sign in the lobby when you
17 enter.
18    Q. Okay.
19    A. The directory. And then we intend to put
20 a sign on our building that we purchased because it
21 has an outdoor sign.
22    Q. When do you expect to open that office?
23    A. Well, as soon as everything is done.
24 We've kind of been moving things in. So it will be
25 an additional office. We're still going to keep the

Page 40

1 8888 Keystone Crossing, but then we'll have that
2 location as well.
3    Q. Is that also located in Indiana?
4    A. It's in Indianapolis.
5    Q. Do you have the address for that?
6    A. 10455 and 10499 College Avenue in
7 Indianapolis, and I don't know the zip.
8    Q. Okay. And, I'm sorry, did you say when
9 you were planning to open this office?
10    A. Within the next few months. I was hoping
11 that it would already be opened by now, but living
12 here and working there is not as easy as you think.
13    Q. Will Eric be at one office and you will be
14 at another?
15    A. Eric will be moving into that office at
16 10455.
17    Q. About how many additional employees do you
18 expect to --
19    A. Well, I've ran some advertisements as far
20 as trying to hire some new employees, and I did some
21 interviews a couple months back and haven't really
22 found -- have some candidates, but haven't hired.
23    Q. How did you run those advertisements?
24    A. Just ran the ads in the paper.
25    Q. In the Star?

Page 41

1    A. In the Star.
2    Q. And those ads would say that they were
3 going to work for Alfa Mortgage?
4    A. Yes, um-hum.
5    MS. CRADDOCK: I don't have any further
6 questions.
7    EXAMINATION BY MR. BASOMBRIO
8    MR. BASOMBRIO: Q. Okay. I have a few.
9 I'm Juan Basombrio. I'm the lawyer for Alfa
10 Corporation.
11    A. Yes.
12    Q. I had a few questions for you.
13    A. Okay.
14    Q. Do you have a lawyer in Indianapolis?
15    A. I do.
16    Q. What's his name or her name?
17    A. Bradley Cohen.
18    Q. Is he with a firm?
19    A. He's with a firm. Cohen, Garelick &
20 Glazier.
21    Q. And is that in Indianapolis?
22    A. In Indianapolis. They're actually in the
23 8888 Keystone Crossing building as well.
24    Q. You said you live here in Oakland now?
25    A. Yes.

11 (Pages 38 to 41)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

Page 42

1    Q.   What's your phone number here, please?
2    A.   (510)336-1977.
3    Q.   Do you still have a residence in Indiana?
4    A.   No.
5    Q.   Prior to choosing the name Alfa Mortgage,
6    did you do a trademark search?
7    A.   Yes, I did, with the State of Indiana.
8    Q.   Only in the State of Indiana?
9    A.   I don't know if it was a national one or
10   not.  I can't remember.
11   Q.   Okay.
12   A.   I cannot recall.
13   Q.   Who assisted you with that?
14   A.   I did that on my own initially before I
15   hired Brad.
16   Q.   Okay.  Do you remember what it is that you
17   did?
18   A.   All the paper filings is what I did.
19   Q.   With the State of Indiana?
20   A.   With the State of Indiana.
21   Q.   And then did your lawyer help you with a
22   wider search?
23   A.   I don't know if he did or not.  I'd have
24   to ask.  I have no idea.
25   Q.   Do you know whether you or he ever did a

Page 43

1    federal trademark search?
2    A.   I do not know.
3    Q.   Okay.  Earlier you said that you had not
4    heard of Alfa Corporation before.
5    A.   That's right.
6    Q.   Spelled A-l-f-a; right?
7    A.   Yeah.
8    Q.   Have you heard of Alfa Insurance, A-l-f-a?
9    A.   No.
10   Q.   Who owns your domain, alfamtg.com?
11   A.   I registered that domain through Genesis
12   when they created my website.
13   Q.   And who is the owner of that domain,
14   yourself?
15   A.   Myself.
16   Q.   Or the corporation?
17   A.   Alfa Mortgage.
18   Q.   When did you -- well, strike that.  Let me
19   ask it another way.
20        Where is Genesis located, do you know?
21   A.   They are in California.  I'm not sure
22   which part of California.
23   Q.   Okay.
24   A.   So --
25   Q.   Other than alfamtg, when you were looking

Page 44

1    for a domain, did you ask them to search for any
2    other names?
3    A.   Yeah.  I mean they searched for Alfa
4    Mortgage.  It wasn't there.  They searched for a few
5    different ones, and then they found that.
6    Q.   Did they search just for Alfa, A-l-f-a?
7    A.   I don't remember.
8    Q.   Did they give you a report back?
9    A.   No.
10   Q.   Is that the only domain with the name --
11   domain name with the name Alfa that you own?
12   A.   Yes.
13   Q.   Your company has never originated any
14   sales outside of the states of Indiana and Oregon;
15   right?
16   A.   Correct.
17   Q.   Do you anticipate continuing the business
18   originations in Oregon?
19   A.   I do intend to.
20   Q.   Okay.  Your income at your company, it is
21   fee based; right?
22   A.   It is, correct.
23   Q.   That's the sole source of income?
24   A.   Correct.
25   Q.   So this would be a fee that you're paid on

Page 45

1    the loan origination?
2    A.   That's right.
3    Q.   Who pays that fee?
4    A.   The fee is paid from the -- our investors.
5    Q.   Okay.  Let's look at the State of Oregon.
6    For the last year, what was the total amount of fees
7    that your business generated there?
8    A.   We didn't really do very much in the State
9    of Oregon.  Maybe we only had, like, one or two
10   closings there in the last year.  So maybe 5-,
11   6,000.
12   Q.   Okay.  And would that be approximately the
13   same for the two prior years?
14   A.   No.  Prior to that, we did do more than
15   that.  Our licensing had expired somewhere in there
16   and then we renewed them, but then there was
17   additional document that was needed and so we never
18   got that far.
19   Q.   For the other years that you were active
20   in Oregon, could you give me an estimate of the
21   total fee receipts?
22   A.   Oh, I don't know, maybe 25,000 roughly.
23   Q.   Okay.  Now, let's turn to Indiana.  Could
24   you give me an estimate of your total -- of the
25   total revenues of your company in Indiana in 2005?

12  (Pages 42 to 45)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

CORINA SHELTON

Page 46

1     A.  In 2005, maybe 80,000, something like
2  that.  2003 and 2004 were much larger than that.
3     Q.  About how much?
4     A.  Probably 3-, 400.
5     Q.  Okay.  What accounts for the decline?
6     A.  My move.  Huge decline.  I -- when I moved
7  to California, I lost pretty much all of my
8  employees because they knew I was leaving and they
9  went elsewhere, so that caused for a big decline.
10    Q.  Okay.
11    A.  And then I went through a lot of some
12 personal issues, a divorce and everything else, that
13 really slowed me down.  So --
14    Q.  Earlier you were saying that you have
15 relationships with about 50 lenders?
16    A.  Um-hum.  Yeah.
17    Q.  Do you actually have relationships with 50
18 lenders or do you work for wholesalers that have the
19 relationship?
20    A.  Well, those are probably investors that we
21 have on approved lender lists, so we have
22 relationships with those investors.  At some point,
23 we originate the mortgage loans through them
24 directly.  So that's --
25        MR. BASOMBRIO:  That's all I have.

Page 47

1        THE WITNESS:  Okay.
2        MS. CRADDOCK:  I have one more question.
3        THE WITNESS:  All right.
4      FURTHER EXAMINATION BY MS. CRADDOCK
5        MS. CRADDOCK:  Q.  You made reference to a
6  decline, being after you moved, you lost a lot of
7  employees.
8     A.  Yes.
9     Q.  How many employees did you have?
10    A.  Well, we only are like six employees, but
11 it was a, you know, it was doing fairly well and
12 then I had to move.
13    Q.  What were those employees -- were they all
14 originators?  I mean --
15    A.  I had an office manager.  I had a
16 processor and then originators.
17    Q.  How many originators did you have?
18    A.  I had four originators, a processor and a
19 manager, which also originated.
20    Q.  The processor did?
21    A.  The manager.
22        MS. CRADDOCK:  Office manager.  Okay.
23      FURTHER EXAMINATION BY MR. BASOMBRIO
24        MR. BASOMBRIO:  You know, I have one
25 follow-up.

Page 48

1     Q.  How much did you spend on advertising last
2  year?
3     A.  Oh, maybe a couple thousand dollars.
4     Q.  And the year before?
5     A.  Probably maybe five.
6     Q.  Okay.
7     A.  Yeah.  I don't think I ever spent maybe 5-
8  or 6,000 a year.
9     Q.  Okay.  That's all I have.
10    A.  It could have been maybe more than that
11 because my monthly, just to run my rates, was maybe
12 4- or 500 -- $500 a month.  So that right there is
13 at least five grand.  So I'd have to really look at
14 the numbers and see.
15    Q.  But it's about that approximation?
16    A.  Maybe, like, between the five and ten.  I
17 don't know if it's exceeded that.
18        MR. BASOMBRIO:  Okay.  We'll just have the
19 same stipulation as always?
20        MS. CRADDOCK:  I think we should ask her
21 if she'd like to read the transcript.
22        MR. BASOMBRIO:  Oh, that's right.  You
23 have the right to read the transcript and make
24 corrections, if you want to.
25        THE WITNESS:  Okay.

Page 49

1        MR. BASOMBRIO:  You've got to work that
2  out with her.  I have no objection to that.
3        MS. CRADDOCK:  If you want to read the
4  transcript --
5        THE WITNESS:  Yes.
6        MS. CRADDOCK:  -- and sign -- yes, you'd
7  like to read your transcript?
8        THE WITNESS:  I would.
9        MS. CRADDOCK:  Okay.  I'll send it to you.
10 The court reporter will send me a copy, and I'll
11 send you a copy for your review.
12        THE WITNESS:  Okay.
13        MR. BASOMBRIO:  Okay.  Thank you.
14        THE VIDEO OPERATOR:  This marks the end of
15 Videotape No. 1 in the deposition of Corina Shelton.
16 The original videotapes will be retained by LegaLink
17 New York.  Going off the record.  The time is 11:22.
18        --oOo--
19        (Whereupon, the deposition was
20        adjourned at 11:22 a.m.)
21        --oOo--
22
23
24
25

13 (Pages 46 to 49)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

# CORINA SHELTON

Page 50

```
1        I declare under penalty of perjury that
2   the foregoing is true and correct.  Subscribed at
3   _____, California, this _____ day
4   of _____ 2006.
5
6
7        _____
8             CORINA SHELTON
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 51

```
1            CERTIFICATE OF REPORTER
2        I, CYNTHIA A. PACINI, a Certified
3   Shorthand Reporter, hereby certify that the witness
4   in the foregoing deposition was by me duly sworn to
5   tell the truth, the whole truth, and nothing but the
6   truth in the within-entitled cause;
7        That said deposition was taken in
8   shorthand by me, a disinterested person, at the time
9   and place therein stated, and that the testimony of
10  the said witness was thereafter reduced to
11  typewriting, by computer, under my direction and
12  supervision;
13       That before completion of the deposition,
14  review of the transcript [ X ]was [  ]was not
15  requested.  If requested, any changes made by the
16  deponent (and provided to the reporter) during the
17  period allowed are appended hereto.
18       I further certify that I am not of counsel
19  or attorney for either or any of the parties to the
20  said deposition, nor in any way interested in the
21  event of this cause, and that I am not related to
22  any of the parties thereto.
23       DATED: _____, 2006
24       _____
25            CYNTHIA A. PACINI, CSR No. 6117
```

14 (Pages 50 to 51)

490a94b6-76c3-40ba-8093-d93ab3ce9dbc

# In The Matter Of:

*ALFA CORPORATION v.*
*OAO ALFA BANK, et al.*

_____

## *CORINA SHELTON*
*July 31, 2006*


_____


# *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171


**SHELTON, CORINA - Vol. 1**



**A**

absolutely 18:15
access 28:16 29:25
  30:1,4
accounts 46:5
Accredited 10:20
  33:19
accurately 6:6
achievement 13:21
Action 4:13
active 45:19
activities 20:7
  22:19
ad 15:16
additional 21:17
  37:8 39:25 40:17
  45:17
address 5:13,16 8:1
  38:25 39:2,3,5
  40:5
adjourned 49:20
ads 15:11,14,19
  40:24 41:2
advertisement
  15:25 18:6
advertisements
  18:9 22:20,24
  40:19,23
advertising 13:13
  15:7,10,23 18:3
  48:1
agent 10:3
ago 35:22
agree 25:22 29:18
Alfa 1:4,7 2:13,15
  3:4,7 4:18 5:2,2,4
  5:6 6:4 7:23
  10:23,25 11:4,5,6
  11:11,19 12:12,15
  12:24 13:3,5,10
  13:11,12,15,24
  14:2 16:7,12
  21:23 22:12,19
  33:25 34:4,13

37:17 38:14 39:1
  41:3,9 42:5 43:4,8
  43:17 44:3,6,11
alfamtg 43:25
alfamtg.com 43:10
ALFA-CAPITAL
  1:8 3:8
allowed 51:17
America 30:7
amount 45:6
answer 6:6,11,24
  6:25 7:4 8:1
anticipate 44:17
anybody 30:3
anymore 19:25
appeared 3:20 4:4
  4:8
appended 51:17
application 25:1,16
  25:17,18,20 38:7
applications 27:5
applies 29:7,9
apply 2:16 24:25
  25:2,15
applying 25:12
  26:25 27:1,6,8
appreciation 13:21
approval 29:20
approvals 38:20
approved 46:21
approximately
  25:4 29:2 33:14
  36:13 45:12
approximation
  48:15
area 34:22
areas 34:22 35:19
articles 12:10
aside 15:25
asked 6:18,24
assisted 42:13
associated 21:4
  38:10
Association 31:19
  31:22 32:20,24

associations 32:11
  37:7
assuming 26:24
attend 31:24 32:15
  32:17,18 33:1,8
  33:11 34:7,8,12
  37:4,11
attended 33:3,6
  34:10
attends 37:8
attorney 4:4,8 5:20
  51:19
Avenue 4:14 40:6
Avon 24:1
aware 31:4
awhile 18:23
A-l-f-a 13:18 43:6,8
  44:6
a.m 3:15 4:16
  49:20

**B**

B 7:22
back 7:1 27:17 28:6
  40:21 44:8
backed 18:24
background 8:18
bank 1:7 3:7 5:2
  9:1,2,7,9,10,15,16
  30:7
banks 33:21,24
based 44:21
basically 8:19
  11:10 12:22,25
  17:1 21:1 25:19
  31:15
Basombrio 2:5,7
  4:4 5:3,3 8:3,11
  8:14 41:7,8,9
  46:25 47:23,24
  48:18,22 49:1,13
becoming 19:16
began 8:7 15:8
  18:16 35:16 38:15
beginning 13:11,12

13:14 15:5 34:3
begun 33:25
behalf 4:5,8 6:4
believe 19:22,24
  28:8 32:13 38:25
belong 32:10
Better 32:13
big 24:7 46:9
biggest 31:20
bit 29:6
board 12:22
bonded 19:4,4,13
  19:25
booth 16:23
borrower 24:25
borrowers 25:2,19
borrower's 26:25
bottles 16:17
Brad 42:15
Bradley 41:17
break 6:14,15
  34:15 37:22
broker 12:15 30:8
  33:6
brokerage 11:10
brokering 9:12
brokers 30:12,23
  31:9,19,21,22
  32:4,18,20,25
brought 8:9
budget 18:2
budgeted 18:5
builder 24:7
builders 23:16,19
  28:17,21 31:14
building 35:22
  39:13,20 41:23
Bureau 32:13
business 16:4,10
  18:17,18 32:9,13
  44:17 45:7
buying 29:13

**C**

C 4:4,11

California 3:16,17
  4:3,17,17 5:16
  18:20 19:5,16
  36:4 38:22 43:21
  43:22 46:7 50:3
call 23:11 30:19
called 3:23
calls 22:25 23:4
  30:20
candidates 40:22
Capital 5:2
car 9:4
cards 16:3,4,10
  22:12 32:9
care 11:9,12,15
Carmel 14:18,19
case 1:6 2:11 3:6
  4:18,18
cause 51:6,21
caused 46:9
center 26:16
Century 10:2,4,10
certificate 2:13
  12:6 51:1
Certified 3:18,19
  51:2
certify 51:3,18
cetera 38:21
Chamber 32:12
changed 26:14
changes 26:13
  27:17,19 51:15
choose 13:5,16
choosing 13:7 42:5
Cindy 4:22
Citibank 33:18
City 33:19
Civ 1:6 3:6
Civil 2:11
clarify 19:15
Clark 4:7,25
click 26:8
clients 22:4,5 23:5
  34:18
closings 23:9 45:10

CORINA SHELTON

**Cohen** 41:17,19
**collect** 29:14
**college** 8:23 40:6
**come** 25:17
**comes** 26:11,12
**coming** 5:12
**commencing** 3:14
**Commerce** 9:10,16
**commercial** 9:9
**companies** 16:25
   23:3
**company** 11:17
   12:7,12 13:9
   14:11 15:17 17:1
   31:5 38:9 44:13
   44:20 45:25
**company's** 22:14
**completed** 8:19
**completion** 51:13
**comprehensive**
   21:7
**computer** 2:16,17
   51:11
**conferences** 31:17
**contact** 15:2 24:12
   25:19 27:24
**contacted** 37:19
**continuing** 44:17
**conventions** 33:6
**copy** 49:10,11
**Corina** 1:14 3:21
   4:20 5:5,15 49:15
   50:8
**corporate** 7:23
**corporation** 1:4 3:4
   4:18 5:4 37:17
   38:18 41:10 43:4
   43:16
**correct** 12:2 20:4
   36:18,20 44:16,22
   44:24 50:2
**corrections** 48:24
**counsel** 4:5,8,23
   51:18
**counselors** 24:9

**country** 13:10
**Countrywide** 33:23
**couple** 10:16 27:7
   40:21 48:3
**courses** 8:23
**court** 1:1 3:1 4:20
   4:21 5:8 6:9 7:6
   11:21 49:10
**covered** 22:17
**CP** 24:7
**Craddock** 2:4,6 4:7
   4:25,25 5:11,12
   7:10 8:8,17 11:21
   11:25 20:17,21
   24:16,20 25:24
   26:3 37:21 38:3
   41:5 47:2,4,5,22
   48:20 49:3,6,9
**created** 43:12
**credit** 29:10,11
   38:8,10,10
**credits** 20:13
**Crossing** 39:5 40:1
   41:23
**CRR** 1:22
**CSR** 1:22 51:25
**current** 11:7 22:18
   39:2
**currently** 10:25
   19:6,11,13,15,23
   20:3,10 21:8,15
   21:24,25 22:22
   39:5
**customer** 9:3,11
**customers** 15:2
   16:21 21:1 23:9
**Cynthia** 1:22 3:17
   51:2,25

_____
            **D**
**D** 2:1 4:11
**database** 25:18
**date** 4:14 12:16
**dated** 12:17,19
   51:23

**dates** 9:17
**day** 3:15 4:6,16 5:1
   13:9 17:2 30:20
   31:1 50:3
**decisions** 11:16
**declare** 50:1
**decline** 46:5,6,9
   47:6
**default** 27:4
**defendants** 1:9 3:9
   3:23 4:9 5:1
**definitely** 25:8
**degrees** 8:20
**delay** 36:8
**department** 30:8
**depended** 18:13
**depends** 24:10 27:1
   29:5
**deponent** 51:16
**deposed** 5:23
**deposition** 1:13
   4:19 5:20 6:23
   8:4,7,10 49:15,19
   51:4,7,13,20
**Description** 2:10
**despite** 8:6
**determine** 38:8
**develop** 30:16
**different** 28:16
   44:5
**direction** 51:11
**directly** 46:24
**directors** 12:23
**directory** 39:19
**disinterested** 51:8
**distribute** 17:10
   18:10 23:6,8,17
   24:2,14 32:7
**District** 1:1,2 3:1,2
   4:20,21
**divorce** 46:12
**document** 2:11,12
   2:14 7:12 12:16
   20:22 45:17
**documentation**

   29:15
**documents** 7:16,18
   8:5,9,12 11:25
   12:1,5 13:1
**doing** 9:10 14:25
   35:23 47:11
**dollars** 48:3
**domain** 43:10,11
   43:13 44:1,10,11
**donated** 18:8
**door** 39:15
**Dorsey** 4:2 5:3
**download** 25:18
**Drive** 4:3 14:17
**drop** 23:11 24:2
   30:18
**duly** 3:24 51:4
**duties** 14:24

_____
            **E**
**E** 2:1 4:11,11
**Earlier** 43:3 46:14
**East** 4:6
**easy** 40:12
**educational** 8:18
   36:5
**either** 17:23 51:19
**employed** 10:25
**employee** 22:1,2,8
   37:4
**employees** 14:21
   21:23 35:25 40:17
   40:20 46:8 47:7,9
   47:10,13
**Encompass** 38:24
**enter** 39:17
**entire** 17:2 34:19
**entirety** 8:4
**equities** 20:12
**equity** 9:4
**Eric** 22:9 40:13,15
**establish** 29:10
   30:21
**estate** 9:12 10:3
   23:12,13

**estimate** 24:13
   45:20,24
**et** 38:21
**event** 17:21 51:21
**events** 16:22 17:12
   17:13,25 18:8
   31:9,12 32:3,8,25
   33:6,10 34:6,9
   37:8,11
**exact** 9:17
**exactly** 16:18 28:12
**EXAMINATION**
   2:4,5,6,7 5:11
   41:7 47:4,23
**EXAMINATIONS**
   2:2
**examined** 3:24
**exceeded** 48:17
**exhibit** 7:7,8,11
   11:22,23 20:17,19
   24:17,18 25:25
   26:1
**EXHIBITS** 2:9
**existence** 27:16
**expand** 13:19
   18:18 35:19 36:1
   36:10
**expanding** 35:24
   36:4
**expect** 39:22 40:18
**experience** 8:24
**expired** 32:14
   45:15
**explain** 12:5 25:11
   29:6 30:5
**e-mail** 25:16 27:24

_____
            **F**
**fairly** 47:11
**far** 9:3 19:18,19
   22:20,22 28:15
   30:7 38:7 40:19
   45:18
**Fargo** 33:18
**federal** 43:1

fee 44:21,25 45:3,4
    45:21
feel 6:25
fees 45:6
files 14:25 29:18,19
filing 15:1
filings 42:18
find 29:12 31:6
finding 29:8
fine 34:16
finished 18:21
firm 41:18,19
first 3:24 7:7 12:6
    15:7 18:16 20:12
Fitness 16:24 17:4
    17:5,5,21
five 9:18 48:5,13,16
five-minute 37:22
Floor 3:16
flyers 16:1 17:2,10
    22:23 30:18
follows 3:25
follow-up 47:25
foregoing 50:2 51:4
forward 29:14
found 40:22 44:5
four 47:18
Four-page 2:11
Francisco 3:16
    4:17,22
free 7:1
Fremont 33:22
front 9:18 39:11,15
fulfillment 13:21
fundraising 18:8
further 2:6,7 8:20
    41:5 47:4,23
    51:18

**G**

G 4:11
Garden 17:13,15
    18:12,14
Garelick 41:19
gatherings 32:1,2

generated 45:7
Genesis 38:22
    43:11,20
getting 19:18
give 8:17 16:20,21
    23:9 44:8 45:20
    45:24
Glazier 41:20
go 7:1 12:4 13:22
    24:3,12 25:1,14
    28:6 29:16
going 5:25 6:3 13:8
    13:18,22 18:20
    27:3 39:25 41:3
    49:17
golf 18:7,11 31:18
Good 4:12
grand 48:13
great 30:23
Gretchen 4:10,13
group 32:21

**H**

halfway 18:24
Handed 17:11
happen 6:23 31:18
happens 25:21
    29:17
happy 6:20
head 6:12 35:1
headed 2:16,18
health 17:3
hear 30:22,25
heard 37:17 43:4,8
help 42:21
hereto 51:17
high 8:18,19,25
hire 15:3 40:20
hired 14:22 40:22
    42:15
history 29:11
hits 27:22
home 9:3 10:20
    14:4,15 17:13,15
    17:17 18:11,14,14

20:11,12,15 22:3
32:19 33:19 39:3
hoping 40:10
hours 35:2
Huge 46:6
Hundreds 31:25
    32:1

**I**

Iacabozzi 22:9
idea 42:24
identification 2:9
    7:9 11:24 20:20
    24:19 26:2
Illinois 18:23 19:5
    20:1,4
important 6:9
improvement
    17:17 18:14 32:19
include 18:18
income 29:14 44:20
    44:23
incorporated 2:13
    5:6 6:4 7:24 11:6
    12:8,12,13,25
    13:3,6,25
incorporation 2:13
    12:7,11
INDEX 2:2
Indiana 1:2 3:2
    10:22 14:20 17:8
    17:18 19:4,7,8
    22:7 23:21,22
    24:8 31:13,17
    32:21,22,24 33:4
    34:19 35:2 36:11
    40:3 42:3,7,8,19
    42:20 44:14 45:23
    45:25
Indianapolis 15:11
    15:22 17:8,16
    18:17 21:21 22:7
    23:23 24:8 32:24
    34:23 35:21 40:4
    40:7 41:14,21,22

individuals 27:5,8
information 24:9
    31:1
initially 42:14
inputting 14:25
instance 30:7
insurance 16:25
    43:8
intend 39:19 44:19
intended 20:25
interact 22:4,5
interested 51:20
Internet 27:14,15
    27:18
interviews 40:21
introduce 4:23
Investments 33:22
investor 29:20
    38:21
investors 30:13
    31:1,10 36:18
    45:4 46:20,22
in-house 30:11
Irvine 4:3
issues 8:1 11:15
    46:12
item 12:14
items 12:22 16:20
    18:11 23:7,17
    24:2
I-a-c-a-b-o-z-z-i
    22:11

**J**

job 8:24
Jones 3:15 4:6,16
    5:1
Juan 4:4 5:3 41:9
July 1:16 3:14 4:15
June 15:18

**K**

keep 39:25
Keystone 39:5 40:1
    41:23

kind 9:4 15:10 18:4
    29:12 39:24
kinds 21:2
KMW 1:6 3:6 4:19
knew 46:8
know 6:15 11:12
    12:17 13:12 15:25
    16:22 18:8 19:18
    23:2,3,5,8,10,16
    23:25 24:10 27:1
    28:7,11 29:11,13
    31:16 32:14 33:20
    34:10 37:12 40:7
    42:9,23,25 43:2
    43:20 45:22 47:11
    47:24 48:17

**L**

larger 33:17,21
    46:2
largest 24:6
Law 3:15 4:4,8
lawyer 41:9,14
    42:21
lead 23:3
lease 39:7
leased 39:4
leaving 46:8
left 9:24
LegaLink 4:13,22
    49:16
lender 10:21 29:20
    29:21 46:21
lenders 29:23,24,25
    30:2,17,23 31:10
    33:14,17,17,19
    34:2,2 36:17
    46:15,18
lending 9:5 35:16
letter 13:19
letterhead 22:14
let's 35:15 45:5,23
Lexington 4:14
licensed 12:15
    18:19,22 19:2,4,6

19:9,11,16 26:23
31:7 35:4
**licensing** 12:14
19:14,17 45:15
**Lifetime** 17:5,7,20
**line** 25:13
**lines** 20:13
**link** 28:8
**links** 28:18
**list** 21:7
**listed** 21:11,14
**lists** 23:2 46:21
**little** 29:6
**live** 41:24
**living** 40:11
**LLP** 4:2
**loan** 2:16 21:3 22:3
24:10 25:12,22
29:7,9,12 38:6
45:1
**loans** 9:3,4,10,12
10:20 11:13 14:4
14:4 20:11 21:2,5
21:14 22:3 27:9
30:4,6,9,11 34:21
34:21 35:3,5,10
35:11,13 46:23
**lobby** 39:16
**located** 17:4,7 22:6
23:20 40:3 43:20
**location** 17:9 40:2
**long** 9:6,22 10:7,8
10:13 11:19 33:3
**look** 7:10 29:11
45:5 48:13
**looking** 29:12
43:25
**looks** 12:18
**lost** 46:7 47:6
**lot** 13:11 23:5
29:25 30:1,22
31:7 35:23 46:11
47:6
**loyalty** 13:21

## M

**mailers** 16:1 22:22
22:25 23:1
**main** 15:24
**Majestic** 10:11,13
10:15
**making** 6:10 35:5
35:13
**manager** 47:15,19
47:21,22
**March** 10:23 11:20
12:8,13,21 14:2
14:12
**mark** 7:6 11:22
20:17 24:16 25:24
**marked** 2:9 7:8
11:23 20:19 24:18
26:1
**market** 34:17,20
**marketing** 16:18
**Markets** 1:8 3:8
5:2
**marks** 49:14
**material** 24:14
**materials** 32:8
**matter** 24:3
**mean** 11:5 19:3
23:25 24:2 29:5
32:17 35:2 36:4
37:10 44:3 47:14
**means** 27:21
**Medford** 38:11
**medical** 10:1
**meet** 24:12 31:9
**meeting** 32:21
**members** 17:3
32:12
**mentioned** 23:7
**menu** 26:18
**Merit** 3:18
**metropolitan** 34:22
**Minnesota** 18:22
19:5,20
**Monday** 1:16 3:14

**money** 18:8
**monitor** 4:15
**month** 29:2 31:14
48:12
**monthly** 32:3 48:11
**months** 10:8 40:10
40:21
**Morgan** 24:7
**morning** 4:12 8:10
12:1
**mortgage** 2:13,15
5:6 6:4 7:23
10:11,14 11:5,6
11:11,13 12:12,15
12:15,25 13:3,5
13:25 14:4 15:13
15:21 16:8,12
17:1 20:16 21:23
22:12,19 29:8
30:4,6 31:15,17
31:19,21,22 32:18
32:20,25 33:25
34:4,13 35:16
38:14 41:3 42:5
43:17 44:4 46:23
**mortgages** 14:10
20:12,12 21:4
36:14,16,19
**mouth** 30:22 31:8
**move** 46:6 47:12
**moved** 10:22 46:6
47:6
**moving** 39:24
40:15
**Multi-page** 2:12
**Mutual** 33:23

## N

**N** 2:1 4:11
**name** 5:13,15 13:5
13:7,13,24 16:7
16:12 18:9 19:18
22:10,15 33:16,20
41:16,16 42:5
44:10,11,11

**names** 23:1,2 44:2
**national** 32:23 33:5
33:19 42:9
**need** 6:14 29:11,15
36:5
**needed** 45:17
**network** 31:16
**networking** 31:9
31:11,13,20 32:3
32:5,6,25 33:10
37:8,11
**never** 8:23 13:22
44:13 45:17
**new** 2:18 4:6,7,14
4:14,21 5:1 24:11
26:9 40:20 49:17
**newspaper** 22:23
**night** 31:13 32:5,6
**nodding** 6:12
**Northern** 9:9,14,16
**notes** 16:13
**noticed** 26:15
**notified** 25:16
**number** 4:18 25:6
42:1
**numbers** 37:2
48:14

## O

**O** 4:11
**Oakland** 5:16
41:24
**OAO** 1:7 3:7 4:18
5:2
**oath** 6:5
**object** 8:3
**objection** 49:2
**offer** 14:3 20:10
21:8,15 30:23
36:11
**offering** 14:9
**office** 11:9 14:14
21:20 23:11,12
35:22,24 39:2,4,7
39:12,22,25 40:9

40:13,15 47:15,22
**officer** 22:3 24:10
**offices** 3:15 4:16
21:18 23:14,18
24:14
**officially** 18:21
**Oh** 19:10 25:5,8
26:7 29:3,24
31:25 32:9 33:4
36:23 45:22 48:3
48:22
**okay** 5:22 6:2,8,9
6:13,21,22 7:3,14
8:16,21,24 9:20
10:19 12:9 13:2
14:9 15:3 19:15
19:20 20:24 21:14
21:17 26:10,12,19
27:2,10,13 28:10
28:13 29:4,19
32:15 33:22 36:7
37:21 38:5,23
39:18 40:8 41:8
41:13 42:11,16
43:3,23 44:20
45:5,12,23 46:5
46:10 47:1,22
48:6,9,18,25 49:9
49:12,13
**once** 8:12 25:15
29:6,9,18 31:14
31:17 34:9
**ones** 16:23 33:5
44:5
**one's** 30:24,24
**One-page** 2:14,16
**online** 25:1,2,15
26:25 28:7,15
**oOo** 1:3 3:3,12 4:1
49:21
**open** 39:22 40:9
**opened** 38:25 40:11
**operation** 35:20
**OPERATOR** 4:12
5:7 37:23 38:1

49:14
**orally** 6:11
**Oregon** 8:22 10:12
18:19 19:5 35:7,8
35:11,13,16 36:3
38:11 44:14,18
45:5,9,20
**organizations** 37:5
**organizing** 15:1
**original** 49:16
**originate** 30:10
36:20 46:23
**originated** 44:13
47:19
**originates** 22:3
**originating** 11:12
35:7
**origination** 38:19
45:1
**originations** 44:18
**originators** 47:14
47:16,17,18
**outdoor** 39:21
**outings** 18:7,11
31:18
**outside** 44:14
**owner** 43:13
**owns** 43:10
**o0o** 49:18

**P**

**P** 4:11
**Pacini** 1:22 3:17
4:22 51:2,25
**page** 2:3,10 7:15,21
12:4,6,10 20:25
24:21,24 26:4,11
26:16,16
**Pages** 1:18 28:7
**paid** 44:25 45:4
**paper** 15:12,19
40:24 42:18
**paperwork** 15:1
**part** 6:23 43:22
**particular** 6:17

20:25 23:13
**parties** 51:19,22
**passing** 17:2
**pay** 38:13
**payrolls** 11:12
**pays** 45:3
**pen** 23:9
**penalty** 50:1
**pens** 16:13
**people** 27:24 28:2
28:22
**period** 35:12 51:17
**perjury** 50:1
**person** 24:12 51:8
**personal** 46:12
**personally** 3:19
**phone** 42:1
**place** 51:9
**places** 18:18 19:1,3
**plaintiff** 1:5 3:5 4:5
5:4
**planning** 35:24
36:1 40:9
**plans** 35:19 36:4,10
**please** 4:23 5:8,13
5:14 7:7 8:17
11:22 12:4 20:18
22:10 24:17 42:1
**point** 6:22 29:14
46:22
**Portland** 8:22 9:1
10:12 18:19 19:9
19:12
**position** 11:2
**possible** 6:7
**Possibly** 36:3
**Post-It** 16:13
**Post-Its** 23:10
**Power** 14:17 39:1
**preapprove** 29:15
**present** 4:10 5:20
**president** 5:5 11:3
11:8,19 12:23
**pretty** 15:24 21:9
21:10 46:7

**printed** 15:20
**printout** 2:16,17
**prior** 37:19 42:5
45:13,14
**probably** 9:18 10:6
10:15 22:24 27:11
27:16 29:3,24
31:6,19 35:14
36:23 39:8 46:4
46:20 48:5
**problem** 7:5
**process** 6:1 18:24
19:14,16 25:12,22
**processing** 38:6
**processor** 14:23
47:16,18,20
**processor's** 14:24
**produce** 7:16
**produced** 7:18 8:5
8:12 12:1
**products** 14:3,6
20:9 21:8 36:10
**professional** 32:10
37:5
**professionals** 31:15
**programs** 30:24
**promotion** 11:16
18:3 37:13,15
**promotional** 18:11
20:7 22:18 23:6
32:7 34:6
**prospect** 16:21
**provide** 28:18
**provided** 51:16
**pull** 38:9
**pull-down** 26:18,24
27:3
**purchase** 14:5
**purchased** 23:2
35:22 39:20
**purchases** 20:13
**purposes** 13:13
**pursuant** 3:13 8:5
**put** 18:9 25:1 27:13
39:14,19

**Q**

**question** 6:18,19,24
7:2 47:2
**questions** 6:5 38:4
41:6,12
**quite** 25:5 31:25

**R**

**R** 4:11
**radio** 37:13
**ran** 40:19,24
**range** 20:11
**rates** 15:12 48:11
**rating** 38:8
**read** 48:21,23 49:3
49:7
**real** 9:11 10:3
23:12,13
**really** 12:18 18:4
22:25 35:6 40:21
45:8 46:13 48:13
**Realtime** 3:19
**realtors** 23:15,19
28:17,22 31:14,20
**reason** 6:15 23:10
**reasons** 36:8
**recall** 42:12
**receipts** 45:21
**receive** 24:9
**received** 25:20
**Recess** 37:25
**recognize** 20:21
24:20 26:4
**record** 5:14,18 6:10
8:8 37:23 38:1
49:17
**reduced** 51:10
**refer** 28:2,22
**reference** 47:5
**referrals** 29:1
**refinance** 14:5
**refinances** 20:13
**reflect** 8:9
**register** 25:15
**registered** 3:18

19:18,21,23,24
20:1,3 43:11
**related** 51:21
**relationship** 24:1,6
24:11 46:19
**relationships** 24:4
28:18,21 30:17,21
33:14 34:3 46:15
46:17,22
**remember** 6:23
10:5 15:4 17:20
42:10,16 44:7
**remembered** 3:13
38:24
**remind** 7:1
**renewed** 32:14
45:16
**renewing** 19:14
**renovating** 35:23
**rep** 10:21
**report** 44:8
**REPORTED** 1:22
**reporter** 3:18,19,19
4:21 5:8 6:10 7:6
11:21 49:10 51:1
51:3,16
**represent** 5:1 26:8
**representative** 7:23
34:13
**represented** 4:3,7
**request** 7:19 8:6
**requested** 51:15,15
**requesting** 7:15
**requirements** 36:6
**reserved** 18:20
**residence** 42:3
**response** 7:19
**responsibilities**
11:8
**rest** 13:1
**restate** 6:19
**resume** 9:17
**retail** 30:10
**retained** 49:16
**revenues** 45:25

CORINA SHELTON

Page 6

review 49:11 51:14
right 5:19,25 6:12
  8:14 43:5,6 44:15
  44:21 45:2 47:3
  48:12,22,23
RMR 1:22
Romania 13:10
roughly 9:21 10:18
  15:5 27:7 45:22
row 16:24 17:23
run 15:14 38:20
  40:23 48:11
running 15:11,12
  15:16

**S**

S 4:11
sales 10:1 24:8
  44:14
San 3:16 4:17,22
saying 6:11 46:14
SBC 28:6
Schedule 7:22
school 8:18,19,22
  8:25
screens 26:13
search 42:6,22 43:1
  44:1,6
searched 44:3,4
second 12:10 20:12
secretary 12:23
  31:6
see 12:18 21:12
  35:15 48:14
seen 7:11
select 26:20
seminars 34:10
send 22:23 29:15
  49:9,10,11
sending 15:25
sent 30:25
service 9:3,11
  36:14,15 38:12,13
serviced 36:16
services 14:3,6 20:9

38:7,17
shaking 6:12
shareholder 12:24
  13:2
Shelton 1:14 3:21
  4:20 5:5,15 7:7,8
  7:11 8:9 11:22,23
  20:18,19 24:16,18
  25:24 26:1,3
  49:15 50:8
she'd 48:21
short 10:1 34:15
shorthand 3:18
  51:3,8
shortly 9:13 14:23
  15:17
show 12:14,22 13:1
  17:14,15 18:12,14
showing 12:7,11
shows 17:18 21:1
  32:16,17,18,19
side 9:5 30:12
sign 2:18 26:9
  39:11,14,15,16,20
  39:21 49:6
site 26:13 27:20,22
  27:25 28:8,16
sites 28:2 38:21
sitting 13:9
six 10:8 47:10
slowed 46:13
small 11:10
software 38:19
sole 12:24 13:2
  44:23
soliciting 31:2,3
somebody 28:15
  29:9
someone's 38:6
soon 39:23
sorry 17:6 30:5
  40:8
sort 5:25 15:23
  21:3,4 27:19
sorts 16:15 17:25

38:17
source 15:24 28:14
  44:23
sources 18:6
Southern 1:2 3:2
  4:20
space 39:4
spell 13:17 22:10
Spelled 43:6
spelling 13:16
spend 48:1
spent 17:2 48:7
stand 13:19
Star 15:12,22 40:25
  41:1
start 13:8 15:16
  18:21 25:22
started 9:1,12 10:2
  10:23 14:2,11
  15:17 18:23 19:17
start-up 9:9
state 5:13 26:16,20
  27:12 31:7 34:19
  42:7,8,19,20 45:5
  45:8
stated 18:16 21:3
  51:9
states 1:1 3:1 20:6
  20:7 26:22 35:4,6
  36:2 44:14
stating 12:11
stationery 16:7
step 5:25
steps 29:8
stipulation 48:19
Street 3:16 4:6,17
strength 29:10
strike 43:18
submit 29:18,19
submitted 25:16
subpoena 2:11 3:13
  7:15 8:5
subscribe 38:7,12
  38:18
Subscribed 50:2

subsequently 18:17
successful 35:5
Sunday 15:15
supervision 51:12
supplement 6:25
  7:4
sure 5:19 16:17
  28:12 43:21
swear 5:8
sworn 3:24 5:9
  51:4

**T**

table 15:13,21
tables 16:25
take 4:19 6:14,15
  11:11 34:15 37:22
taken 37:25 51:7
tall 39:13
target 34:17,19
Technology 4:2
telemarketing
  22:25 23:4
television 37:15
tell 6:18 20:24
  22:18 31:11 36:13
  51:5
teller 9:2
ten 25:7,8 30:19
  48:16
term 36:20
terms 25:23
Terrabella 5:16
testified 3:24
testify 6:4
testimony 51:9
Texas 27:8,9
Thank 5:12,22 11:7
  21:17 27:13 49:13
Thanks 5:7
thereof 3:15
thereto 51:22
thing 38:24
things 16:15,18
  23:11 26:15 39:24

think 14:17 16:16
  16:18 17:19,22
  37:10 40:12 48:7
  48:20
thinking 13:8,10,20
third 7:15 12:14
thousand 48:3
three 29:3 35:2,14
  35:15
time 4:15 6:16
  13:18 14:7,14
  18:5 30:19 35:12
  36:5 37:24 38:2
  39:3 49:17 51:8
titled 2:11,12,14
today 4:21 6:3,11
  8:12
Today's 4:14
top 35:1
topics 7:16
total 45:6,21,24,25
tough 13:7
tracking 27:21
trade 32:15,17,18
trademark 42:6
  43:1
training 34:10
transcript 48:21,23
  49:4,7 51:14
treasurer 12:24
true 50:2
truth 51:5,5,6
truthfully 6:6
trying 16:16 40:20
turn 7:14,21 45:23
turned 8:6
two 9:23 14:23
  17:23 21:1 29:3
  35:2,14,15 45:9
  45:13
Two-page 2:17
typewriting 51:11
T-shirts 16:16

**U**

CORINA SHELTON

**um-hum** 14:13
  16:13 24:22 26:17
  26:21 28:25 31:23
  33:15 34:12 35:18
  39:10 41:4 46:16
**understand** 5:19
  6:17 7:14,22 11:4
**underwriting**
  38:21
**UNITED** 1:1 3:1
**updated** 27:20
**updates** 26:14
**USA** 1:8 3:8
**use** 28:2 29:21,23
  30:4,12 38:9,19
  39:6
**user** 2:18 26:9
**usually** 32:9,18
  34:8
**U.S** 9:1,7

**V**
**versus** 4:18
**video** 4:12,13,15,19
  5:7 37:23 38:1
  49:14
**Videotape** 49:15
**VIDEOTAPED**
  1:13
**videotapes** 49:16
**visitors** 27:22
**Vogel** 4:13
**VOGEL-Videog...**
  4:10
**Volume** 1:17
**vs** 1:6 3:6

**W**
**walk** 30:18
**want** 5:18 8:3
  13:14 29:19 33:20
  48:24 49:3
**wanted** 13:13
**wants** 24:25 37:11
**Washington** 33:23

**wasn't** 44:4
**Water** 16:17
**way** 5:16 13:17
  28:12 31:8 43:19
  51:20
**web** 28:16
**website** 20:23,25
  24:22 25:17 26:5
  26:14 27:14,16
  28:3,19 30:14
  43:12
**websites** 30:15
**welcome** 37:11
**Wells** 33:18
**went** 8:22 9:2 28:7
  46:9,11
**we'll** 40:1 48:18
**we're** 6:10 19:24
  39:25
**we've** 23:4,16,17
  27:12 35:3 39:24
**Whitney** 4:2 5:4
**wholesale** 30:5,8,9
  30:10,12,12,14
**wholesalers** 46:18
**wholesales** 30:3
**wide** 20:11
**wider** 42:22
**within-entitled**
  51:6
**witness** 3:23 5:5,8
  5:9,10 8:13,16
  47:1,3 48:25 49:5
  49:8,12 51:3,10
**word** 30:22 31:8
**work** 9:2,6,22 10:7
  10:10,13 23:13,15
  25:12 26:22 41:3
  46:18 49:1
**worked** 9:9,23,24
  10:11,15,20,21
  23:17
**working** 9:1,14
  10:2,4 14:15
  40:12

**wouldn't** 21:12
**written** 6:10

**X**
**X** 2:1 51:14

**Y**
**yeah** 21:9 22:5 32:2
  33:18 35:9 43:7
  44:3 46:16 48:7
**year** 16:24 22:24
  31:17 33:8 35:22
  45:6,10 48:2,4,8
**yearly** 32:1,2
**years** 9:8,23 10:16
  10:17 16:24 17:23
  35:14,15 45:13,19
**Yellow** 28:7
**York** 4:6,7,14,14
  4:21 5:1 49:17

**Z**
**zip** 40:7

**$**
**$500** 48:12

**#**
**#6117** 1:22

**0**
**01** 15:5,18 27:18
**02** 15:6 17:23 35:18
**03** 17:24,24
**03-384235** 1:23
**04** 1:6 3:6 17:24
**04-CIV** 4:19
**08968** 1:6 3:6

**1**
**1** 1:18 2:11 7:8
  49:15
**10:19** 3:14 4:16
**100** 36:23 37:1
**10017-6702** 4:7
**10450** 39:1

**10455** 40:6,16
**10456** 14:17
**10499** 40:6
**10560** 39:1
**11** 2:12
**11:05** 37:24
**11:11** 38:2
**11:22** 49:17,20

**2**
**2** 2:12 11:22,23
**20** 2:14 25:9
**20th** 12:8,13
**2000** 10:22,22,23
**2001** 10:24 11:20
  12:8,13,21 14:2
  14:11,12 27:16
  33:5
**2002** 19:10 35:17
  39:8,9
**2003** 17:19,22
  19:22 20:2 27:17
  27:19 36:24 46:2
**2004** 17:22 36:22
  46:2
**2005** 36:14 45:25
  46:1
**2006** 1:16 3:14 4:15
  50:4 51:23
**21** 10:2,4,10
**222** 4:6
**24** 2:16
**24-Hour** 16:24
  17:4,5
**25th** 12:19,20
**25,000** 45:22
**26** 2:17
**26th** 3:16

**3**
**3** 2:14 20:18,19
  46:4
**31** 1:16 3:14
**31st** 4:15
**38** 4:2

**4**
**4** 2:16 24:17,18
  48:12
**400** 46:4
**41** 2:5
**41st** 4:6
**420** 4:13
**4272** 5:16
**46033** 14:20
**47** 2:6,7

**5**
**5** 2:4,17 25:25 26:1
  45:10 48:7
**50** 25:10,11 29:24
  32:3 33:14 36:21
  36:22 46:15,17
**500** 48:12
**51** 1:18
**510)336-1977** 42:2
**555** 3:15 4:17

**6**
**6,000** 45:11 48:8
**60** 32:3
**6117** 51:25

**7**
**7** 2:11

**8**
**80,000** 46:1
**8888** 39:4 40:1
  41:23
**89** 9:2
**8968** 4:19

**9**
**90** 33:7
**92618-5310** 4:3
**94619** 5:17
**95** 9:19
**96** 10:6
**97** 10:18
**99** 10:18